## Irwin Savings & Trust Company *v.* Pennsylvania Railroad Company, Appellant.

Argued September 28, 1943; reargued January 10, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

reargument refused May 22, 1944.

*Robert D. Dalzell,* of *Dalzell, McFall & Pringle,* for appellant.

*John E. Evans, Jr.,* with him *John E. Evans, Sr.,* of *Evans, Evans & Spinelli,* for appellee.

OPINION OF MR. JUSTICE DREW, April 20, 1944:

This case arose out of the facts of a particularly sad and distressing accident. It is a combined action of a

personal representative, Irwin Savings & Trust Company, brought to recover damages for the estates of four minor children of one family, ranging in age from about three to eight years, and also damages for their parents, because of the drowning of the children in a pool of water partly upon property of defendant and partly upon property of an adjacent owner, which had been formed by the diversion of the waters of a small stream by the failure of defendant to keep open a culvert beneath its track.

At the trial, binding instructions for defendant having been refused, the case was submitted to the jury and verdicts were returned for each of the minor's estates and for the parents. Upon refusal of motions for judgment n. o. v. and a new trial and the entry of judgments on the verdicts, defendant took these appeals.

In considering the motions for judgment n. o. v. we will view the evidence in the light most favorable to plaintiffs, as we are required to do while considering a motion of this kind: *Anstine v. Penna. R. R. Co.,* 342 Pa. 423, 20 A. 2d 774.

The scene of this tragic accident was a very rural section of Little Sewickley Creek Valley in Westmoreland County. About 1890 defendant made a survey there for a single track branch line, and shortly thereafter the line was built; an embankment about 18 feet in height was filled in between low ground or marsh land and Little Sewickley Creek. A three-foot stone and pipe culvert was placed to carry a small sulphur stream under the track, and it was located about 400 feet from the lower end of the marsh. For many years this low ground was swampy with water in varying amounts, more in winter than in summer, but never amounting to much. About two years before this accident, the culvert became blocked by debris which had flowed into it, and the water which should have passed through it was diverted and flowed back over the low ground or marsh and formed a pool about 250 feet in length, about

90 feet across at its widest point, with a depth of 10 to 12 feet toward the center. This pool was plainly visible from the railroad track and defendant's foreman, whose duty it was to keep the culvert open, passed this place many times in the two years before the accident but did nothing to remedy the condition. There is no doubt defendant knew, or should have known that the culvert was closed for a long period of time, and that the water that should have gone through it had formed a large pool on its land and that of an adjacent owner. That defendant was negligent in not opening the culvert and releasing the water, is conceded. That such could be done and at small cost is admitted.

The Kustro family lived on a farm south of the valley, distant about 500 feet from the pool. There are a few other houses close by, one on adjacent property occupied by Mike Montecupo. There was testimony that a number of children played around the pool in the summer and on the ice in the winter.

On Sunday, March 23, 1941, the Kustro children were invited to play on the Montecupo property and they were there with John Montecupo, the neighbor's boy, nine years of age, when they decided to go to the pond. His testimony follows: "Q. What did the children do? A. Went straight on the ice. Q. What were they doing? A. There was a kite up a tree with a string coming, there was a string— Q. Where was the string? A. The string was on the pond. Q. What did they do? A. Yunko took hold of the string. Q. Yunko, that is Johnny, Jr.? A. Yes. Q. Then what happened? A. Then the string broke, then they was walking up around like by the string and Mary fell in. Q. Where did Mary fall in? A. About almost in the middle. Q. Was there ice on there at that time? A. Yes. Q. Then what happened to Mary? A. Then Yunko wanted to go after her, he went; Peter wanted to go after him, he went. Anna fell in—I mean I called her. She said she was going to jump too so she went. Q. You called her?

A. Yes. Q. Why did you call her? A. I didn't want her to go in. Q. What did she do? A. She jumped in. Q. Did they come up again? A. No. Q. Then what did you do? A. I went up to my dad." The mother testified: "Q. On this Sunday afternoon did you know that the children were playing with a kite? A. Well Mary, she was home, she had a kite at home. Q. She did have a kite at home? A. Mary had a kite but Junior didn't have any and he was trying to make one. I was in bed, I seen him through the window, he had a butcher knife and he was trying to make one but he couldn't make it."

When the accident was reported help was summoned and the bodies of the children were removed from the water at a point where the depth was ten or twelve feet. It was testified that the string of the kite was fastened "tight on the hand" of two of the children.

The children were not trespassers, they had a right to be on the Montecupo property, having been invited there by the tenant. But owner and tenant testified they had not given defendant any permission to place the pool on their land, and it must be conceded that defendant was a trespasser in so doing. This case must not be confused with those where the injured person is a trespasser on property of another who causes the injury. But even if the children were trespassers, "The defense of no liability for injury to a trespasser is personal to the owner of the premises trespassed upon; it does not inure to the benefit of strangers to the title, adjoining owners, or other trespassers": *Fitzpatrick v. Penfield,* 267 Pa. 564, 574, 109 A. 653.

The so-called "playground" or "attractive nuisance" cases likewise have no application here. This is obvious because the children were not upon defendant's premises. In the former the use of private grounds by trespassing children must be such as to cause the place in the immediate vicinity to be generally known as a recreation center: *Prokop v. Becker,* 345 Pa. 607, 29 A. 2d 23. We do not have anything of that kind here. To consti-

tute the latter, the owner must maintain on his premises an object or instrumentality, by which if left unguarded a child with his natural curiosity to investigate may by playing with it, setting it in motion, or running against it sustain an accident: *Pietros v. Hecla C. & C. Co.,* 118 Pa. Superior Ct. 453, 180 A. 119. We have nothing of the kind here because a pool or pond is not an attractive nuisance where there is no unusual danger: *Murdock v. Pa. Railroad Co.,* 150 Pa. Superior Ct. 156, 27 A. 2d 405; 20 R. C. L., Negligence §85, p. 96; 36 A. L. R. 34.

It is strongly urged the case should not have been submitted to the jury. The record shows that there is not a particle of conflict in the evidence and therefore we are bound to conclude that the question of proximate cause was for the court. Where it is alleged that an injury arose from negligence the question of the proximate cause is to be decided by the jury upon all the facts of the case, but where the facts are undisputed, and the intervening agency is manifest, it is not error for the court to withhold the evidence from the jury: *Hoag v. Lake Shore & Michigan Southern Railroad Co.,* 85 Pa. 293; *West Mahanoy Township v. Watson,* 112 Pa. 574, 3 A. 866; *Rugart v. Keebler-Weyl Baking Co.,* 277 Pa. 408, 121 A. 198; *Leoni v. Reinhard,* 327 Pa. 391, 194 A. 490; *Joseph v. United Workers Assn.,* 343 Pa. 636, 23 A. 2d 470; *McGrath v. E. G. Budd Mfg. Co.,* 348 Pa. 619, 36 A. 2d 303.

Defendant's principal contention is that it could not have been reasonably anticipated or foreseen that its failure to keep its culvert open would result in this unfortunate accident to these children while playing with or chasing their kite. Unless such action by defendant was the proximate cause of the accident it is not liable in damages. We said in *Hoag v. Lake Shore & Michigan Southern Railroad Co.,* supra, p. 298: ". . . in determining what is proximate cause, the true rule is, that the injury must be the natural and probable consequence of the negligence—such a consequence as, under the sur-

rounding circumstances of the case, might and ought to have been foreseen by the wrongdoer as likely to flow from his act." And in *Rugart v. Keebler-Weyl Baking Co.*, supra, we approved the following language of the learned court below, p. 413 : "Without attempting to define formally what is meant by the term 'proximate cause', we may safely affirm, in the case of a tort, that, in order to fall within this category, an act must be such as will probably result in harm, and that a cause is regarded in law as remote if an injury complained of was an unlikely or improbable consequence thereof." The test is whether the injury or death would probably result from the act of omission or commission; not whether it may result. In *Pass. Ry. Co. v. Trich,* 117 Pa. 390, 399, 11 A. 627, we said: "But things or results which are only possible cannot be spoken of as either probable or natural. For the latter are those things or events which are likely to happen and which for that reason should be foreseen. Things which are possible may never happen, but those which are natural or probable are those which do happen, and happen with such frequency or regularity as to become a matter of definite inference. To impose such a standard of care as requires, in the ordinary affairs of life, precaution on the part of individuals against all the possibilities which may occur, is establishing a degree of responsibility quite beyond any legal limitations which have yet been declared."

It is too much to suppose that a prudent man, of ordinary intelligence, exercising due care, and with the responsibility that was upon defendant, could have anticipated and foreseen this unfortunate happening. It would be impossible for anyone to visualize the actual occurrence, the children running out upon the ice in pursuit of the kite, of the catching of the kite in the tree near the center of the pond, the breaking of the string which was held by two of the children, of the efforts of the children to get the kite and the string, and the giving way of the ice and the tragedy that followed.

In a somewhat analogous situation it was held in *National Metal Edge Box Co. v. Agostini,* 258 F. 109, 111, that the company was not liable for the death of a five-year-old boy, who, when playing on the roadway, as was customary and known to the company, threw a stick upon the ice in a canal under the company's control, and while attempting to recover it was drowned. There it was said: "The decedent was not moved by temptation, if any, offered by the ice upon the canal or its attractiveness to play thereon, but by his wish to recover his 'nipsie' [a stick sharpened at one end]. Therefore we need not consider what effect might be given to a situation where children have played in the neighborhood or upon the canal and without objection from the plaintiff in error, or occasions when they have sometimes been ordered away. . . . The temptation, on this occasion, to leave his place of play, and to run out upon the ice upon the canal to recover his plaything, can in no sense be said to be either due to an invitation or a nuisance which attracted children."

While it is conceded by defendant that its failure to keep open the culvert was negligence, yet the evidence here conclusively establishes that that omission was but a remote cause of the accident. The act of the children themselves in chasing their kite over the ice was the direct, proximate cause of the accident. All defendant could possibly have foreseen from its diversion of the stream was that the water might run over on the property of the adjoining owner. This conclusion is supported by a long line of cases in our own jurisdiction, some of which are as follows:

In *Hoag v. Lake Shore & Michigan Southern Railroad Co.,* supra, an engine of defendant railroad ran into a landslide, was thrown off the track, oil cars exploded and the oil took fire; the burning oil was carried down a creek, then swollen by the rain, for 200 feet and set fire to plaintiffs' property. In holding that defendant was not liable this court said, p. 298: "The probable

consequences of the collision, such as the engineer would have a right to expect, would be the throwing of the engine and a portion of the train off the track. Was he to anticipate the bursting of the oil-tanks; the oil taking fire; the burning oil running into and being carried down the stream; and the sudden rising of the waters of the stream, by means of which, in part at least, the burning oil set fire to the plaintiff's building? This would be a severe rule to apply . . ."

In *West Mahanoy Township v. Watson,* supra, this court held as a matter of law that the negligent act of the township in leaving an ash heap on a road was the remote and not the proximate cause of the loss of plaintiff's horses which ran off the road and were killed by a train when the sleigh they were drawing struck the ash heap and overturned.

In *Marsh v. Giles,* 211 Pa. 17, 60 A. 315, a seven-year-old boy, while he and his friend were playing with one of a number of large stones which defendant had left on the unpaved footway of a back street, was injured, and this Court held that defendant's act in leaving the stones on the footway was not the proximate cause of the plaintiff's injury, inasmuch as the accident was due to the independent act of plaintiff's companion in making a use of the stone not reasonably to have been foreseen.

In *Carpenter v. Miller & Son,* 232 Pa. 362, 81 A. 439, we held that a dealer in fireworks, who placed the rubbish from his place of business on a dumping ground, paying for the privilege, was not liable for the injuries sustained by a twelve-year-old boy who went there, picked out a piece of fireworks, carried it home and that night lit it and was hurt by the resulting explosion. There it was said, p. 365: "His [plaintiff's] injury could not reasonably have been contemplated as the result of the appellee's act in placing the rubbish on the lot. The boy's own act was the direct, proximate cause of his injuries."

In *Rhad v. Duquesne Light Co.*, 255 Pa. 409, 100 A. 262, the defendants' chauffeur left his car standing at the curb on a down grade, after setting the brake. A boy in passing rattled the brake, whereby it was released and the car started down the street and struck plaintiff. In holding that there was no liability on defendant's part, under the circumstances, this Court said, p. 415: "Here then we have a new, independent and unexpected factor, which was in itself the real occasion of the mischief. The effective cause of the injury was shown to be the interference of the boy, and it was not the failure of the chauffeur to use the additional precaution of turning the front wheel against the curb."

In *Bruggeman v. City of York*, 259 Pa. 94, 102 A. 415, it appeared that defendant municipality had raised the grade of a lot and caused water and mud to overflow the sidewalk of plaintiff; that plaintiff, while sweeping off the pavement, in an effort to remove a coil of wire which had become lodged in the sidewalk or gutter, pushed it with her broom so that it sprang back and splashed mud into her eye, causing the loss of her sight. In holding that defendant was not liable for this accident, this Court said, p. 98: "The rule is well settled 'that the injury must be the natural and probable consequence of the negligence; such a consequence as under the surrounding circumstances of the case might and ought to be foreseen by the wrongdoer as likely to flow from his acts': *Swanson v. Crandall*, . . . [2 Pa. Superior Ct. 85]. Such an injury as is here complained of could not be foreseen as a result of permitting mud and filth to remain in a roadway; nor could it be foreseen that any personal injury would result therefrom to a person upon the sidewalk. The immediate cause here was not set in motion by the original wrongdoer, nor was it the result of an unbroken succession of events, or of concurring causes."

In *Rugart v. Keebler-Weyl Baking Co.*, supra, the minor plaintiff, a boy sixteen years of age, was in-

jured while installing electric connections in defendant's bakery for an independent contractor. He was on top of a mixer under a water pipe, and while waiting for his fellow employee to pass the wires through a conduit, he amused himself by exchanging pleasantries with the girls employed in the bakery. For some unknown reason, one of the girls threw a piece of dough at him and it struck the sprinkler pipe nearest to him. Its impact on the pipe set off the sprinkler system and the water blinded and confused him. In this dazed condition, his arm and body became involved with a revolving shaft nearby, causing serious injuries. There we approved the following language of the learned court below, p. 413 : " 'We think, however, that binding instructions to find for the defendant should have been given, because under the plaintiff's own theory as to how Frederick Rugart's arm came into contact with the shaft, the accident could not have been foreseen by the defendant as a probable result of its failure to turn off the power that caused the shaft to revolve.' "

In *Matlack v. Penna. P. and L. Co.*, 312 Pa. 206, 167 A. 37, plaintiff's husband was killed by coming in contact with an electrically charged wire of defendant while working on a girder above a bridge. We said there, p. 209, in affirming the judgment of nonsuit entered for defendant: "The court below was correct in determining that there was not sufficient evidence of the defendant's negligence to warrant the submission of this case to the jury. In determining whether or not there has been negligence it has been held that the consequence should be one which in the light of attending circumstances an ordinarily prudent man ought reasonably to have foreseen might possibly occur as the result of his negligence."

In *Leoni v. Reinhard,* supra, it was held that a good cause of action is not averred by a statement of claim which alleges that defendant's truck was carrying a load of unslaked lime on the highway, that as the vehicle passed the minor plaintiff, a child twelve years of age,

a piece of the lime fell from the truck and was picked up by him; and that he placed it in a bucket of damp earth he was carrying, and almost immediately the lime exploded and he was injured. There this Court said, p. 395: ". . . the injury to the plaintiff was not the proximate result of driving a truck loaded with lime upon the highway. The hazards that materialized into injury were so remote and unlikely that the defendant was under no duty to anticipate their existence."

The same result is reached if this factual situation is considered from another angle. Defendant clearly owed a duty to the adjoining owner not to trespass upon his ground. But there is nothing in this record to show that as to the children there was any duty by defendant to keep open its culvert. The highly remarkable circumstances which led to the accident—the children chasing their kite upon the ice, which gave way under them and caused their death—were not discernible to any human anticipation or foresight. There was no breach of duty to the children, and hence no negligence upon which a recovery can be based. In this connection, it is stated in the Restatement, Torts, §281, comment c: "If the actor's conduct creates a recognizable risk of harm only to a particular class of persons, the fact that it causes harm to a person of a different class, to whom the actor could not reasonably have anticipated injury, does not render the actor liable to the person so injured." See also *Harris v. Lewistown Tr. Co.*, 326 Pa. 145, 152, 191 A. 34, where this Court said: "A breach of duty owed to one class of persons cannot create a cause of action in favor of a person not within the class. A plaintiff must show that as to him there was a breach of duty."

For these reasons, the learned court below erred in not determining as a matter of law that the proximate cause of the accident was the independent act of the children, and in not giving binding instructions for defendant. In this disposition of the case it is unnecessary to consider the other assignments.

Judgments reversed, and judgments are here entered in favor of defendant.

DISSENTING OPINION BY MR. CHIEF JUSTICE MAXEY:

I dissent from the majority opinion. The negligence of the defendant company in failing to keep its culvert open to carry off the water from a small sulphur stream under its track (a thing which it could do at a trifling expense), and so creating a large pond on the Montecupo land is clear: *Ficke v. Pa. R. R. Co.*, 157 Pa. 622, 626, 27 A. 783; *Harber v. Pa. Ry. Co.*, 56 Pa. Superior Ct. 59, 64-65. See also 67 C. J. pp. 869, 873, Secs. 294(2) and 296(c). This negligence is so indisputable that in this appeal the defendant Railroad Company does not deny it. It is equally indisputable that "the children were not trespassers, they had a right to be on the Montecupo property"; and children of the neighborhood played around this pool "practically every day", as one witness testified, from the time the area was flooded. In the winter they played on the ice and in the summer they played around the pool. Notice of the flooded condition, as well as the children playing there, was brought home to the defendant company not only by the length of time that this condition existed, but also by notice to its track foreman whose duties were to keep in condition this section of the track with the sewers and culverts under it and who testified that he spent his full time as foreman on this section of track which was nineteen miles long, and that for over thirty years he was familiar with the piece of ground that Montecupo leased. He said he went back and forth along this track, passed this place frequently, and worked around there as often as two or three times a week, during the year or two prior to the time when the children were drowned.

In the light of these established facts, *is* it "too much to suppose" (as the majority opinion *says* it is) "that a prudent man, of ordinary intelligence, exercising due

care, and with the responsibility that was upon the defendant, could have anticipated and foreseen this unfortunate happening". And *would* it be (as the majority opinion says it was) necessary "for anyone to visualize the actual occurrence, the children running out upon the ice in pursuit of the kite, and the catching of the kite in the tree near the center of the pond, the breaking of the string, and the giving way of the ice and the tragedy that followed."

I think the sound and almost universally accepted rule is ". . . The harm which was foreseeable and the specific harm which actually resulted need *not* be *absolutely identical* . . . . . .", nor, that the defendant "could not foresee *the precise manner* in which the harm would occur, nor the exact nature of the harm, nor the full extent of such harm. What must be foreseen, in order to establish negligence, is 'harm in the abstract, not harm in the concrete.' The defendant need not foresee 'that an injury should occur *in the exact way* and to the same extent as that which did occur,' he need only foresee that some injury of a like general character is not unlikely to result from failure to use care": (italics supplied) Jeremiah Smith in Legal Cause in Actions of Tort, "Selected Essays on the Law of Torts" 649, p. 690.

Professor Harper in his treatise on the Law of Torts (January 1940) says: ". . . the courts are perfectly accurate in declaring that there can be no liability where the harm is unforeseeable, if 'foreseeability' refers to the general type of harm sustained. It is literally true that there is no liability for damage that falls entirely outside the general threat of harm which made the conduct of the actor negligent. *The sequence of events, of course, need not be foreseeable. The manner in which the risk culminates in harm may be unusual, improbable and highly unexpectable, from the point of view of the actor at the time of his conduct.* And yet, if the harm suffered falls within the general danger area, there may be lia-

bility, provided other requisites of legal causation are present." (Italics supplied).

It cannot be said as a matter of law that the defendant's neglect which created this pond on the land of a third party where children were invited to play and where the defendant knew they played did *not* create a "general danger area", a situation where injury was reasonably probable. In *Bonczek v. Philadelphia,* 338 Pa. 484, 489, 13 A. (2d) 414, 416, we held in an opinion by Mr. Justice STERN that ". . . The city might not have been able to anticipate the exact nature of a likely accident or the extent of the harm which might be occasioned, but it could readily have foreseen the probability of the children playing on or around it and of injury resulting to them. At least the jury was justified in so finding, and the position of the city is all the more indefensible because the condition of disrepair was such that the bench was practically useless as a seat, and therefore its presence in the park served no real purpose." In *Mars v. Meadville Telephone Co.,* 344 Pa. 29, 31, 23 A. (2d) 856, we said: "The rule is thus stated in Cooley on Torts (1st Ed. p. 70; 4th ed., sec. 50) : 'If the original act was wrongful, and would naturally, according to the ordinary course of events, prove injurious to some other person or persons, and does actually result in injury through the intervention of other causes which are not wrongful, the injury shall be referred to the wrongful cause, passing by those which were innocent.' "

The Restatement of the Law of Torts, Vol. 2, sec. 386, p. 1033, enunciates this principle: "Any person, except the possessor of land or a member of his household or a licensee acting on his behalf, who creates or maintains upon the land a structure or other artificial condition which he should realize as involving an unreasonable risk of death or serious bodily harm to others whom he should recognize as likely to be upon the land, is subject to liability for bodily harm thereby caused to them, irrespective of whether they are lawfully upon the land, by

the consent of the possessor or otherwise, or are trespassers as between themselves and the possessor." The phrase "or other artificial condition" clearly includes a deep body of water artificially created through neglect and which in winter freezes.

That ponds are, both in summer and in winter, attractive to children is as well known as any fact in human experience. That ponds freeze in cold weather and that children unapprehensive of danger often venture upon ice when it is too weak to bear their weight is attested by the annual newspaper reports of the drowning of hundreds of such children. That a pond which serves no useful purpose of any kind and which in fact constitutes a trespass upon another's land, as this pond did, should be eliminated by the party responsible for its creation and maintenance, particularly when that pond is in a neighborhood where there are young children, is a truth so obvious as to be self-evident. "The true-basis" of the modern rule now accepted in this jurisdiction, and generally, as to "the duty" of the possessor of a dangerous instrumentality which is attractive to children to do whatever is reasonably necessary to safeguard such children against injury from that instrumentality is, as we said (p. 592) in *Thompson et al. v. Reading Co.*, supra, "the value of child life to the community" (quoting "Pennsylvania Annotations to the Restatement of the Law of Torts" (1938), p. 177, sec. 339). We added (from the same quotation) : "The danger arises out of the likelihood of child trespassing . . ." To hold as legally responsible in damages the defendant who created and maintained this dangerous and totally useless pond of water, to which these children were naturally attracted with such fatal consequences, is obviously to the advantage of society, for it tends to protect human life, and as CARDOZO well said: "It is true, I think, today in every department of the law the social value of a rule has become a test of growing power and im-

portance". CARDOZO: "The Nature of the Judicial Process", p. 73.

The court below properly said "The pool which produced the drowning was not, at the site of the accident, upon the property of the defendant but was cast upon the property of another, due to the defendant's negligence." The court with equal propriety could have added that these children were express invitees of the owner [1] of "the place". We think this case is clearly within the rule set forth in the Restatement of the Law of Torts, Sec. 386, supra.

The cases cited by the majority in support of its opinion that this court shall hold as a matter of law that there was a failure to prove the existence of causal relation between the defendant's negligence in failing to keep open the culvert and backing the water upon the lands of others and the drowning, because the drowning could not have been reasonably foreseen are inapposite here because in those cases the injurious results were brought about by intervening agencies, and they and not the negligence complained of were the "proximate cause". Even where there were intervening agencies, we have not always held that *they* were the "proximate cause". In *Mautino v. Piercedale Supply Co.*, 338 Pa. 435, 13 A. (2d) 51, we said, in an opinion by Mr. Justice PATTERSON, "Intervening human action, whether innocent or negligent, is not a superseding cause of harm, which an actor's conduct is a substantial factor in bringing about, if such action ought to have been foreseen." In *Hendricks v. Pyramid Motor Freight Corp.*, 328 Pa. 570, 195 A. 907, Mr. Justice LINN said: "The answer to this inquiry depends on whether the [intervening] conduct was so extraordinary as not to have

---

[1] Whether this owner of the land was *also* guilty of negligence in inviting children to play on or near this dangerous pond is not in issue here. He at any rate had no power to remove this nuisance, as the defendant had.

been reasonably foreseeable, or whether it was reasonably to be anticipated."

In *Nelson v. Duquesne Light Co.*, 338 Pa. 37, 12 A. 2d 299, this court said: "The court would not have been justified in determining as a matter of law that the city was not negligent and the negligence of Messinger was the sole proximate cause of the accident. As to proximate cause, section 447 of Restatement of Torts, says: 'The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or (b) . . . or (c) the intervening act is a normal response to a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.' This comment is added, (p. 1198): 'e. The words "extraordinarily negligent" denote the fact that men of ordinary experience and reasonable judgment, looking at the matter after the event and taking into account the prevalence of that "occasional negligence, which is one of the incidents of human life," would not regard it as extraordinary that the third person's intervening act should have been done in the negligent manner in which it was done.' Viewing Messinger as the 'third person' and the City of Pittsburgh as the 'actor' *it cannot be held as a matter of law that the 'actor' should not have realized* when it permitted the pole to be placed in the line of traffic *that a motorist might crash into it,* nor can it be said that the motorist's conduct was so 'extraordinarily negligent' that the city could not have foreseen it when it permitted the pole to be placed and to remain in the street."

The rule enunciated by us in these decisions and others, is applicable where the defendant has foreseeably increased the chance of harm through another force, and the rule is unquestionably sound and accepted gen-

erally by the courts. See Carpenter on "Proximate Cause". 14 So. Calif. Law Rev. 115-153.

It is a well established rule that when an instrumentality has a recognizable potentiality for harm to human beings, he who controls that instrumentality must resort to every reasonable measure to eliminate or reduce that potentiality or respond in damages to anyone injured by it, if the injured person is without fault. That a pond covered with ice has a potentiality for harm to human beings, and especially to children, is a fact established by human experience. That the defendant "controlled" this pond is a fact in this case for it was defendant's failure to keep the culvert open which created the pond. That the defendant could have eliminated the pond by simply clearing the rubbish from the culvert was proven by the fact that after the drowning of these children it did so. By the defendant's own witnesses it was shown that it required only eight hours' work by three men to drain this pond and thereby abate this nuisance. This was accomplished by the simple expedient of opening the culvert, thus enabling it to perform the functions which it was designed to perform. This pond which was a nuisance was at all times the creature of this defendant and subject to its complete control. When the defendant acted with due care this pond, which served no useful purpose and which unlawfully worked injury to others, ceased to be a menace. Justice MITCHELL, speaking for this Court in *Collins v. Chartiers V. Gas Co.*, 131 Pa. 143, 159, 18 A. 1012, said: "On the question of negligence knowledge is always important, and may be conclusive. Hence the practical inquiry is, first, whether the damage was necessary and unavoidable; secondly, if not, was it sufficiently obvious to have been foreseen, and also preventable by reasonable care and expenditure?" *45 C. J.* at p. 657 says in respect to the duty to provide against an injury to another or to his property which might reasonably be foreseen: "It is not necessary, in order to impose this duty,

that injury should be inevitable, that the danger thereof should be great, or even that the chances of injury should exceed the chances of absence of injury; but it is sufficient that injury is likely or reasonably probable", citing cases. In *MacPherson v. Buick Motor Co.*, 217 N. Y. 382, 111 N. E. 1050, Judge CARDOZO said: "Because the danger is to be foreseen, there is a duty to avoid the injury. . . . The presence of a known danger, attendant upon a known use, makes vigilance a duty. We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law."

In cases similar to the case at bar the Courts of other jurisdictions [2] have generally held that the resulting damage fell within the general threat of harm created by the defendant's negligence, and the latter's negligence was the legal and proximate cause thereof.

In *Daroren v. Kansas City*, 273 S. W. 401 (Kan.), the action was for the death of two twin boys, 6 years and seven months old by drowning in a pond, which was created upon private property by the city constructing a high fill for a street. After the pond was created it remained for 19 years preceding the drowning of the boys. The city had notice of the common practice of children in the neighborhood playing upon and about the pond. While playing on the ice, the ice gave way and the boys were drowned. The Supreme Court of Missouri held that "The legal obligation rests upon all who create

---

[2] To these cases may be added the following: *Linnberg v. City of Rock Island*, 136 Ill. App. 495; *Kansas City v. Siese*, 71 Kan. 283, 80 Pac. 626; *Renno v. Seaboard Airline Railway*, 120 S. C. 7, 112 S. E. 439; *Wheeler v. St. Helens*, 153 Ore. 610, 58 Pac. (2) 501; *City of Indianapolis v. Emmelman*, 108 Ind. 530, 9 N. E. 155; *Doyle v. City of Chattanooga*, 128 Tenn. 443, 161 S. W. 997; *Chicago v. Hesing*, 83 Ill. 204; *Bowman v. Omaha*, 59 Neb. 84, 80 N. W. 259, reaffirmed 63 Neb. 333.

or allow such dangerous conditions, to use reasonable precautions to see that no unnecessary injury shall flow therefrom to others, and if that duty is violated and injury results, the guilty party will be held liable in damages." In the *City of Elwood v. Addison,* 59 N. E. 47 (Ind.), the complaint alleged that the death of the plaintiff's child, 7 years old, was caused by the negligence of the city in constructing a culvert in such a manner that it was easily obstructed, and that the water in which the child was drowned was thus accumulated at the side of the street. Children would stop there and throw sticks into the water. The child, which was drowned, stopped and threw some sticks in and in some manner slipped from the edge of the sidewalk into the water and lost his life. The court there held: ". . . the theory of the pleading, so far as the appellant's negligence is concerned, is the maintenance of the culvert in a condition which caused a large and dangerous pool of water to form in close proximity to the street and sidewalk. The immediate cause of the death was the pool of water near the street and sidewalk, but this was necessarily incident to the city's wrongful act in maintaining an insufficient culvert to carry away the water. The result that did happen would not have happened had there been a sufficient culvert. The maintenance of the insufficient culvert was the proximate, although not the immediate cause of the death. We fail to see upon what principle a wrongdoer may be permitted to take advantage of his own wrong by stating that the injury resulted from a more immediate cause, when this immediate cause was put in operation by his own wrongful act . . ." In *City of Altus v. Milliken,* 98 Oklahoma 1, the city assumed the duty of constructing a spillway to prevent the creation of a pond. The city failed to construct the spillway and a pond was created, which had a considerable shallow area, but contained a deep and dangerous hole. The boy was wading in the pool and stepped into this hole and was drowned. The court held that ". . . If this had been

done [the spillway constructed], and this duty had been discharged, the accident would not have occurred. The proximate cause of the accident was a question of fact for the jury under proper instructions . . ." In *City of Omaha v. Richards,* 49 Neb. 244, 68 N. W. 526, a boy ten years old was drowned when he fell from a wooden sidewalk which was then floating upon a pond of water part of which was in a public street and a part upon private property. The pond was created by the negligence of the city in grading the street but leaving no sufficient outlet for the surface water which accumulated in said drain, except a manhole to drain the water. The court said in sustaining a verdict for the plaintiff: "It was the duty of the city to have constructed the sewer and street in question in such a manner as to provide a proper and adequate outlet for the water that might have been reasonably expected to come down this ravine. In failing to do so, the city authorities were guilty of negligence. That such negligence was the direct and approximate cause of the death . . . is established to a moral certainty."

In *Best, Adm. v. District of Columbia,* 291 U. S. 411, the facts were that a wharf for unloading sand lay adjacent to a public street from which for want of a proper fence or barrier, its surface was visible and accessible, and children of tender years were attracted to the sand piles and were accustomed to enter and use the wharf as a playground, going in and out at their pleasure, and it was held in an action for the death of a child alleged to have been caused by negligence in maintaining such a place that the owner was under a duty to take reasonable precautions either to prevent such use or to keep the flooring in repair so that children would not be exposed to the danger of falling through the holes. In that case Chief Justice HUGHES, speaking for the Supreme Court, said: "Were the case merely one of an accessible wharf, it could not be said that the District would be subject to liability from the fact, without more, that a child

strayed there and fell from the wharf into the water. The duty must find its source in special circumstances in which, by reason of the inducement and of the fact that visits of children to the place would naturally be anticipated, and because of the character of the danger to which they would unwittingly be exposed, reasonable prudence would require that precautions be taken for their protection. Here, . . . the location of the wharf, unfenced, close to the street with the barrier partly down, taken with the use of the wharf for unloading sand, make it a likely place for children to play. Sand-piles close at hand would constitute "a bait" they would inevitably follow. . . . They did follow it and they used the wharf as a playground at their pleasure. As the authorities of the District had reason to anticipate that use, there was a duty to take reasonable precautions either to prevent it or to keep the wharf in such proper state of repair that children would not be exposed to the danger of falling through holes."

In the instant case the water could be seen from the place where the children *lawfully* were, and "children were in the habit of going to the place", and their visits to the place should not only have been anticipated but were actually known to the defendant. Due regard for human life required the defendant company to abate the continuing trespass for which it was responsible, and which was obviously a place of danger to children and which actually resulted in the death of four children who were lawfully on the premises where they were drowned.

In *Thompson et al. v. Reading Co.*, 343 Pa. 585, 595, 23 A. 2d 729, we cited with approval what Lord MAC-NAGHTEN said in *Cooke v. Midland Great Western Railway* 1909, A. C. 229, as follows: "Would not a private individual of common sense and ordinary intelligence, placed in the position in which the company were placed, and possessing the knowledge which must be attributed to them, have seen that there was a likelihood of some injury happening to children resorting to the place and

playing with the turntable, and would he not have thought it his plain duty either to put a stop to the practice altogether, or at least to take ordinary precautions to prevent such an accident, as that which occurred?" Substitute the word "pond" for "turntable" in that excerpt and the language applies perfectly *to the instant case*. The only "ordinary precautions" the instant defendant would have had to take to remove this utterly useless and, as the tragic multiple drowning proved, deadly pond nuisance would have been the expenditure of a few hours labor of a few men to clear out from its culvert the debris which backed up the water which formed the pond in which these four young children lost their lives at innocent play. According to the testimony of the defendant's foreman, it required only the work of three employees for eight hours to clean out the blockading culvert and thus release the dammed up waters of this trespassing pond.

In the case of *Altenbach v. Lehigh Valley R. R. Co.*, 349 Pa. 272, in which we handed down the opinion on April 17, 1944, we upheld a recovery by parents for the accidental drowning of their four year old son in a reservoir built and maintained by a Railroad company for a *useful* purpose in a neighborhood where there were children. It was shown in that case, as it was in the instant case, that children frequently played about the reservoir. We said in that case: "The danger was evident to the defendant company for it erected a high fence around the entire reservoir, presumably anticipating the exact nature of such an accident as occurred here. The defendant up to this point met its duty to such children. It failed in its duty of ordinary care, however, when it permitted this fence to get into a condition of disrepair such as was shown by the testimony."

If in *that* case the company had erected no fence at all around its reservoir it would have been no less culpable than it was in erecting a fence that it permitted to fall into disrepair. In the case *now before us,* the de-

fendant company created and maintained this pond by its negligent act; the pond served *no* useful purpose; children played around it "practically every day" and the defendant was not only legally chargeable with knowledge of the fact that children played around this pond near its railroad tracks, but the defendant's track-walker whose duty it was to inspect the section of the company's property which included the blocked culvert was in the vicinity of the spot where the drowning took place, two or three times a week for at least a year before the drowning.

That this drowning took place a considerable period after the culvert was allowed to be blocked and the pond created does not decrease the defendant's responsibility in the slightest degree.

The defendant's position which the majority of this court upholds, is stated by it as follows: ". . . could it have been reasonably anticipated that the overflow of the water in this low spot would result after a year and a half or two years in the drowning of these four children by their walking out upon ice too thin to hold them while playing with or chasing a kite." In *Schmidt v. Merchants Despatch Trans. Co.*, 270 N. E. 287, 300; 200 N. E. 824, the New York Court of Appeals said: "Through lack of care a person may set in motion forces which touch the person or property of another only after a long interval of time; and then only through new, fortuitous conditions," citing *Ehret v. Village of Scarsdale*, 269 N. Y. 198, 199 N. E. 56.[3] The point of time mentioned in the defendant's expressed position, therefore, does not affect the question whether the defendant's breach of duty upon which the action is brought is the proximate cause of the death of these children "except as it may afford evidence for or against proximity of causa-

---

[3] In this case asphyxiation occurred almost one year after defendant's employee laid a pipe drain under street surface, and in so doing damaged the gas main which was incased in the drain.

tion". 1 Shear & R. (Rev. Ed.) 93, Sec. 34. In other words, proximity of causation is not measured by the calendar.[4]

The trial of this case was free from error; the real issue was: should this defendant have reasonably anticipated that some child or children playing around this pond created and maintained by its neglect (and it *was chargeable* with knowledge that young children *were* so playing) would meet with either serious or fatal injury? We think the jury was fully justified in answering this question in the affirmative. What did happen here could easily have been anticipated; ordinary forethought by the defendant's agents and servants and the expenditure of a trifling sum of money would have prevented the drowning of these four young children. I would affirm the judgment of the court below.

Mr. Justice HUGHES concurs in this dissent.

---

[4] In an article in 25 Harvard Law Review 103, 106-7, on "Legal Cause in Actions of Tort", Jeremiah Smith says: "It is a mistake to suppose that contiguity in space or nearness in time are legal tests of the existence of casual relation. . . . Proximate cause as a term to indicate the relation of legal cause and effect is a misnomer."