Kite *v.* Jones, Appellant.

340

Argued April 22, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*James J. Leyden,* with him *Josephine H. Klein* and *Schnader, Harrison, Segal & Lewis,* for defendants, Jones and Yellow Cab Company, appellants.

*Edward I. Weisberg,* with him *David N. Feldman,* for defendant, Renick, appellant.

*John B. Martin,* with him *Duane, Morris & Heckscher,* for plaintiff, appellee.

*F. X. McClanaghan,* with him *Cogan & McClanaghan,* for defendant, McCloskey & Co., appellee.

OPINION BY MR. JUSTICE BELL, June 6, 1957:

Plaintiff, a pedestrian, was an innocent victim of a collision between a taxicab of the Yellow Cab Company and an automobile driven by Albert Renick, at the intersection of 16th Street and Pennsylvania Boulevard, Philadelphia. Plaintiff sued the Yellow Cab Company and its driver, Ellis H. Jones. Yellow Cab Company brought in Albert Renick as additional defendant, and he in turn brought in McCloskey and Company as additional defendant, and McCloskey and Company in turn joined the City of Philadelphia as additional defendant. The City filed preliminary objections which were sustained, and the complaint was dismissed as to the City.

The trial Judge, at the conclusion of the testimony, entered a nonsuit on behalf of McCloskey and Com-

pany. The jury rendered a verdict in favor of plaintiff in the amount of $40,000 against Yellow Cab Company, Jones and Renick. Yellow Cab Company and Jones thereafter filed a (separate) motion for judgment n.o.v. and for a new trial, assigning, among other reasons for a new trial, the Court's refusal to take off the nonsuit. Defendant Renick also filed a motion for a new trial, alleging, inter alia, that the verdict was excessive. All of these motions were dismissed. Appeals were taken by each of the above mentioned defendants from the judgment on the verdict for plaintiff against the defendants in the sum of $40,000.

Plaintiff on the evening of April 6, 1953, at about 8:45 p.m., was walking north on the west side of 16th Street. It was a dark rainy night. After looking for traffic at the intersection, plaintiff proceeded to cross Pennsylvania Boulevard. When he was almost across the street he was struck by Renick's automobile, which in turn had been struck by the Yellow taxicab driven by Jones. The impact of the taxicab collision with Renick's car swung the rear of Renick's car in a semi-circle, first northward, then westward, when it struck and injured Kite who was in the west cross walk, a few feet from the north curb of Pennsylvania Boulevard. The testimony by the driver of each car differed widely, as so often happens in these cases. 16th Street at the time of the accident was 26 feet from curb to curb. However, a high fence which had been erected by McCloskey and Company protruded into 16th Street on the east side (near the southeast corner of the intersection) so that the street at that point was only 17 feet wide. Pennsylvania Boulevard is 38 feet wide and is a two-way street.

Plaintiff called as for cross-examination Renick. He testified that he was driving his car on the north side (correct side) of Pennsylvania Boulevard in a westerly

direction. He stopped his vehicle at the northeast corner near a stop sign; looked to his left and saw no vehicles or lights so he proceeded to the street line where he stopped again. He testified that at this point he saw no vehicles or lights to his left. He then went forward and when the window of his car came to the line of the fence or just beyond it, he looked left again and at that point he saw blurry lights about 100 feet from his car. Renick then continued onward at 5 or 6 miles an hour for about 15 feet, and when his car was almost completely across the trolley tracks on 16th Street the left rear side of his car was struck by the left front fender of the Yellow taxicab. He claimed that his vehicle was on its right lane (right-hand side) of Pennsylvania Boulevard.

Plaintiff also called as for cross-examination Jones, the driver of the Yellow Cab Company. He testified he was operating his taxicab north on 16th Street and was straddling the east rail of the trolley tracks on 16th Street; that he was driving at a speed of 20 miles an hour and continued into the intersection without reducing his speed. Despite the rain he said he had a clear vision in all directions for 60 or 70 feet, except, of course, to the extent that the McCloskey fence limited his vision of traffic to his right on Pennsylvania Boulevard. When his taxicab reached the southeast corner of 16th Street and Pennsylvania Boulevard he saw for the first time Renick's car coming toward him from the right. Jones testified he was 6 feet north of the southeast corner of 16th Street and Pennsylvania Boulevard when he first saw Renick's car. At one point he said he did not see Renick's car until it was right in front of him; at another point he testified that he did not see Renick's car at all. He also testified that he saw Renick's face looking toward him and at that time he was about to go across the intersection.

Jones further testified that Renick's car was on the left instead of the right side of Pennsylvania Boulevard, and that if it had been on its right side of the street he would have been able to see it 35 feet before the accident. He also testified that when his taxi stopped after the collision, its front end extended only 6 feet north of the McCloskey fence. Although the testimony showed that Renick's lights were on, Jones did not see any lights of Renick's car.

A jury can, of course, believe all or part of or none of the testimony of each witness. Without further discussion of the evidence, it is clear that the jury could have found that both Jones and Renick were guilty of negligence and consequently the lower Court properly dismissed the (respective) motions for a judgment n.o.v.

McCloskey and Company's fence was 8 to 10 feet high. On February 10, 1953 McCloskey received a letter from Deputy Commissioner of Traffic Leslie Williams, which notified him that the fence was so high as to create an unnecessary traffic hazard and that the fence should be lowered to the eye level of a person sitting in a passenger car on 16th Street and for a distance of from 50 to 75 feet on Pennsylvania Boulevard. Even without this actual notice, a jury could reasonably have found from the height of the fence and the other facts and circumstances of the case that McCloskey and Company was guilty of negligence in erecting such a high fence at that intersection. Nevertheless, we conclude from the evidence that the negligence of McCloskey and Company was not a proximate cause of the accident and that a judgment of nonsuit was properly entered as to it: *Listino v. Union Paving Co.*, 386 Pa. 32, 124 A. 2d 83; *DeLuca v. Manchester Laundry and Dry Cleaning Co., Inc.*, 380 Pa. 484, 112 A.

2d 372; *Klimczak v. 7-Up Bottling Co.*, 385 Pa. 287, 122 A. 2d 707.

In *Listino v. Union Paving Co.*, 386 Pa., supra, the Court said (pages 36-39) : "It is hornbook law that plaintiff has the burden of proving that defendant's negligence was the proximate cause of the accident: DeLuca v. Manchester Laundry and Dry Cleaning Company, Inc., 380 Pa. 484, 112 A. 2d 372; Helm v. South Penn Oil Co., 382 Pa. 437, 114 A. 2d 909; Lanni v. Pa. R. R. Co., 371 Pa. 106, 88 A. 2d 887; Brusis v. Henkels, 376 Pa. 226, 102 A. 2d 146. . . .

"The law on the subject of intervening acts and superseding cause is difficult to formulate because so many varied situations can and do arise, and for these reasons it has not always been uniformly expressed.

"The question boils down to whether the chain of causation was broken and superseded by an intervening act.

"Perhaps the best expression of the principle in question is found in DeLuca v. Manchester Laundry and Dry Cleaning Company, Inc., 380 Pa., supra. In that case a judgment non obstante veredicto was entered by this Court upon the ground that an intervening act of negligence was the superseding cause of the accident. Chief Justice STERN said (pages 488-492) :

" ' . . . assuming, arguendo, that the Laundry Company was guilty of a violation of the provisions of the statute and therefore negligent per se, such negligence was not a ground of liability unless it was the proximate and efficient cause of the accident in question: Hayes v. Schomaker, 302 Pa. 72, 77, 152 A. 827, 829; Hutchinson v. Follmer Trucking Company, 333 Pa. 424, 427, 5 A. 2d 182, 183; Shakley v. Lee, 368 Pa. 476, 478, 84 A. 2d 322, 323; Purol, Inc. v. Great Eastern System, Inc., 130 Pa. Superior Ct. 341, 344, 345, 197 A. 543, 544, 545; Vunak v. Walters, 157 Pa. Superior Ct. 660,

662, 43 A. 2d 536, 537. This is because an act of negligence which creates merely a passive background or circumstance of an accident does not give rise to a right of recovery if the accident was in fact caused by an intervening act of negligence which is a superseding cause: Stone v. Philadelphia, 302 Pa. 340, 153 A. 550; Schwartz v. Jaffe, 324 Pa. 324, 332, 188 A. 295, 298; Kline v. Moyer and Albert, 325 Pa. 357, 191 A. 43; Ashworth v. Hannum, 347 Pa. 393, 397, 398, 32 A. 2d 407, 409; Venorick v. Revetta, 152 Pa. Superior Ct. 455, 33 A. 2d 655.

" 'The question, then, is whether the parking of the Laundry Company's truck, even if it were a violation of the statute and therefore an act of negligence, was a proximate or only what the law regards as a remote cause of plaintiff's accident. . . .

" 'In Kline v. Moyer and Albert, 325 Pa. 357, 191 A. 43, a truck was negligently parked on the highway in the dusk of a late afternoon. A car in which the plaintiff was a guest rider started to pass the standing truck when another automobile coming in the opposite direction swerved from the rear of the truck and struck plaintiff's car in a head-on collision. The question in the case was whether a cause of action could be maintained against the driver of the standing truck or whether his negligence had been superseded by that of the driver of the automobile which struck plaintiff's car. It was held that if the driver of the car saw and knew of the position of the standing truck and nevertheless thereafter proceeded negligently, with the result that the accident occurred, the original negligence of the driver of the truck had become a non-causal factor divested of legal significance; as to it the chain of causation had been broken and responsibility remained solely with the operator of the offending car. The applicable principle was formulated as follows: "Where

a second actor has become aware of the existence of a potential danger created by the negligence of an original tortfeasor, and thereafter, by an independent act of negligence, brings about an accident, the first tortfeasor is relieved of liability, because the condition created by him was merely a circumstance of the accident and not its proximate cause.". . .

" 'Ordinarily the question whether the negligence of a defendant is a proximate cause of the accident is for the fact-finding tribunal (Landis, Administratrix v. Conestoga Transportation Company (No. 1), 349 Pa. 97, 100, 36 A. 2d 465, 466), but where the relevant facts are not in dispute and the remoteness of the causal connection between defendant's negligence and plaintiff's injury clearly appears from the evidence the question becomes one of law, and as such, is within the scope of appellate review: Rugart v. Keebler-Weyl Baking Co., 277 Pa. 408, 414, 121 A. 198, 200; Leoni v. Reinhard, 327 Pa. 391, 396, 194 A. 490, 492; Irwin Savings & Trust Company v. Pennsylvania R. R. Co., 349 Pa. 278, 283, 37 A. 2d 432, 434; Frisch v. Texas Company, 363 Pa. 619, 621, 622, 70 A. 2d 290, 291, 292; Roche v. Pennsylvania R. R. Co., 169 Pa. Superior Ct. 48, 57, 82 A. 2d 332, 337. . . .' "

All of the contentions in regard to the liability of McCloskey and Company are fully answered in the aforesaid opinion.*

---

* McCloskey and Company have moved to quash the appeals because no appeal was taken from the judgment of nonsuit entered against it. While ordinarily that would be a valid ground for quashing an appeal, we do not so consider it in this case because by analogy to cases where verdicts are rendered for or against certain defendants in trials arising out of the collision of two or more automobiles, this Court in recent years has granted a new trial as to all parties in some cases where the interest of justice required it, even though no appeal was taken from a judgment in favor of

The question of excessiveness of the verdict is bothersome. Kite was Vice President of the Fire Association of Philadelphia in charge of the casualty, fidelity and surety operations of that company. He did not lose any salary as a result of the accident, although he claimed loss of "earning power" for total disability of about $10,000. His actual expenses were doctors $1,014; nursing services $754.50; hospitalization $1306.86; and miscellaneous $182.25—a total of $3,257.61.

Plaintiff, age 64, was knocked unconscious on April 6, 1953, when Renick's automobile struck him. His leg was broken, one eye was closed and he had pain in both the head and the leg. His leg was set several days later at the hospital and a few days later was reset and steel pins were inserted horizontally through the bones so that the ends protruded at each end of the fracture site. There was a comminuted fracture of the middle third of the shaft of the tibia and fibula, and the break involved several fractures. In July 1953 the pins were removed by the doctor without an anaesthetic. Dr. Jones saw the patient regularly for x-ray, manipulation, removal and reapplication of the cast until January 5, 1954, at which time there was abnormal mobility at the fracture site. A second operation was performed on January 8, 1954. An incision had to be made over the right hip and bone grafts were removed and packed around the fracture site. A pin was inserted by making a drill hole in the tibia below the knee joint. Finally union took place and the cast was removed on March 23, 1954.

---

one of the defendants. For recent examples see *Miller v. Pa. R. R. Co.*, 368 Pa. 507, 84 A. 2d 200; *Nebel v. Burrelli*, 352 Pa. 70, 41 A. 2d 873; *Biehl v. Rafferty*, 349 Pa. 493, 37 A. 2d 729; *Kline v. Moyer*, 325 Pa. 357, 191 A. 43; *Stone v. Philadelphia*, 302 Pa. 340, 153 A. 650.

Plaintiff was in the hospital from April 6, 1953 to April 20, 1953. He then went home and remained in bed until the end of May, 1953. From June 1, 1953 until the middle of October, 1953, Kite was in a wheelchair; thereafter he was on crutches until January 1954, when he again entered the hospital. After leaving the hospital January 23, 1954, Kite stayed home until February 1, then he was on crutches or a crutch until May 20, 1954. After the cast was finally removed Kite's leg was atrophied and weak and would swell after use. He started playing golf in November, 1954, although the leg still gets tired and he says he has a slight limp.

Dr. Olsen, a neuro-surgeon, examined plaintiff after the accident and diagnosed his condition as a concussion of the brain and nerve injury to the forehead, which is permanent but *not disabling* or of any significance.

We are not in accord with plaintiff's claim that he had an impairment of earning power in the amount of $10,000.

Appellants ask that the verdict of $40,000 be reduced to $20,000, and in support thereof cite *LaPosta v. Himmer*, 358 Pa. 69, 55 A. 2d 751, and *McCarthy v. Ference*, 358 Pa. 485, 58 A. 2d 49. In the first case a 29 year old rigger (in good health) sustained spiral fractures of both bones of his right leg above the ankle, underwent *several* operations and required a permanent steel plate in his leg. His injury resulted in a shortened leg and permanent disability which cut his earnings from $90 to $43 a week. His loss of wages and out-of-pocket expenses totaled $6,000. The evidence conclusively showed a permanent loss of future earning power and that plaintiff a skilled laborer, would never again be able to do anything more than the work

of an unskilled laborer. The jury's verdict of $20,350 was reduced to $18,000.

In *McCarthy v. Ference*, 358 Pa., supra, a 26 year old clerk suffered compound fractures of both bones of the left lower leg and of the right femur. He spent over five months in the hospital, his right leg was permanently shortened from half an inch to an inch, and there were limitations of both the left ankle and the right knee. Notwithstanding these severe injuries there was no proof of impairment of future earning power. His loss of wages was $1,750 and his medical expenses $3,512.60. This Court reduced a verdict of $35,000 to $20,000 in spite of his extremely severe injuries and pain and suffering and permanent deformity. In each of these cases the plaintiff's loss of wages and medical expenses were larger and his injuries appeared to be equally as severe as in the instant case.

The test or standard for an appellate Court is clear but ofttimes difficult to apply: Is the verdict so excessive or inadequate that its affirmance constitutes a manifest abuse of discretion: *Sherman v. Manufacturers Light and Heat Co.*, 389 Pa. 61, 132 A. 2d 255; *Karcesky v. Laria*, 382 Pa. 227, 114 A. 2d 150; *Nikisher v. Benninger*, 377 Pa. 564, 105 A. 2d 281; *Carpenelli v. Scranton Bus Co.*, 350 Pa. 184, 38 A. 2d 44.

The appellant, Renick, urges that the plaintiff was not entitled to any compensation for loss of salary, and that in permitting the jury to consider this item in its assessment of damages the trial Judge committed an error of law. In his charge to the jury, the trial Judge said:

"The next item for you to consider is the loss of wages. True enough, Mr. Kite was paid by his employer, but he was hospitalized for some time, and he was confined to his home for some time, and, when he

found it at all possible, he went in and discharged his duties. He went in, I think, in the beginning, in a wheelchair, and, subsequently, on crutches, and later on he used a cane.

"The fact that his employer paid him is not to enure to the benefit of anyone who is liable for the damages, so that is an item that you are to consider in your deliberations as to the amount of the verdict, if you find there is to be a verdict for Mr. Kite."

It was stipulated that the plaintiff had actually received his full salary during the period in question. The plaintiff, however, advances the proposition that loss of salary (or loss of partial earning power) should be based on his disablement in the hospital and at home, regardless of the fact that he was paid his salary (of $10,000) during that period; and consequently that the trial Judge properly charged the jury. The law is clear that if a plaintiff receives his regular compensation during the period of his incapacity he may not recover for his loss of salary or wages unless he affirmatively shows that these payments were a gratuity from his employer: *Antonelli v. Tumolo,* 390 Pa. 68, 132 A. 2d 285; *Pensak v. Peerless Oil Co.,* 311 Pa. 207, 166 A. 792; *Schwoerer v. Philadelphia,* 167 Pa. Superior Ct. 356, 74 A. 2d 755. Cf. *Stevenson v. Pa. Sports and Enterprises, Inc.,* 372 Pa. 157, 93 A. 2d 236. In *Pensak v. Peerless Oil Co.,* 311 Pa., supra, the Court said (pages 209, 210):

"The item, wages . . . cannot be sustained. It is based on a loss of salary during the time plaintiff was incapacitated. But he did not lose any salary. It was paid to him. True he says it was a gift. . . . His salary was $85 per week and he received it. Characterizing as a gift the money paid to him does not make it so. To permit a recovery of money under the guise of wages

lost would, with the facts as they here appear, open a wide door to misrepresentation and fraud in this class of cases."

In *Stevenson v. Pa. Sports and Enterprises, Inc.*, 372 Pa., supra, the Court said (page 163) : " 'Whether a plaintiff may recover loss of wages from a tortfeasor where the injured party has been paid the wages by his employer is to be determined by the evidence. The rule of law is clear: if the payments by the employer were a gratuity or gift, claimant may recover for loss of wages against a third party tortfeasor. The generosity of the employer does not redound to the benefit of the wrongdoer.' "

The plaintiff testified in that case that the money paid to him by his employer was a gift and the Court found that there was ample evidence from which the jury could have concluded that the payments were a gift rather than wages.

In the case at bar, plaintiff has failed to (1) allege, or (2) prove that the payments of salary which he received as an executive (vice president) from his employer after the accident were a gratuity.

In the light of the evidence in this case it was error for the Court to allow the jury to award plaintiff damages for loss of salary which he claimed amounted to $10,000, and which he did not lose but, on the contrary, received. We believe that the ends of justice will best be served, not by awarding a new trial, but by reducing the judgment.

Judgment in the amount of $40,000 is reduced to $30,000 and as thus modified, is affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

W. Stanley Kite, 61 years of age, was injured on April 5, 1953, in an automobile accident, liability for which is now settled. The violence of the impact was such that he suffered unconsciousness and fractures of the leg which caused it to hinge in the wrong direction. He underwent three operations, his leg was placed in a cast several times, he was immobilized many months in the hospital and in his bed at home. His leg underwent atrophy to the extent that he now walks with a limp. He also carries in the mended bone a steel pin, the presence of which may in the future subject him to another operation. In addition to the leg disablement the plaintiff experienced a nervous facial twitching and some memory loss resulting from the brain concussion.

The jury awarded him a verdict of $40,000, which the Majority of this Court has reduced to $30,000. I see no warrant for this drastic action. We have frequently said that a verdict is to be reduced only when it shocks our sense of justice.* I feel no shock.

As vice president of an insurance company the plaintiff Kite received an annual salary of $19,500. The appellant Renick admits in his brief: "As a result of this accident, he did not attend his office on a regular basis from April 7, 1953, until October, 1953, a period of approximately six months. During the next three months he continued to wear a cast and to use crutches. He underwent a second operation in January, 1954, from which he convalesced at home until February, 1954."

Although the appellant thus concedes that the plaintiff was unable to attend to his duties for almost ten months, he argues that the plaintiff is not entitled

---

* *Fasick v. Byerly*, 331 Pa. 85, 89.

to any monetary damages for this period (exclusive of medical expenses) because he was paid his regular salary. But if Kite's employer was benevolently disposed toward his injured employee and was willing to pay him his salary even though he did not work, what right does Renick have to complain? A tortfeasor is responsible monetarily for all damages flowing from his tortuous act, irrespective of kindnesses visited upon his victim. A tortfeasor may not ask credit for the value of an artificial limb donated to the person who lost a leg through his negligence. The coins cast into the hat of the crippled victim of an accident are not to be turned over to the person who crippled him.

The majority of this Court has decided that Renick is correct in his position that there should be deducted from the jury's verdict the amount of salary paid Kite during the controverted period. However, in supporting the appellant's position the Majority cites a case which is authority to the exact contrary of what the appellant maintains. The Majority Opinion quotes from the case *Stevenson v. Pa. Sports and Enterprises, Inc.,* 372 Pa. 157, 163, as follows: " 'Whether a plaintiff may recover loss of wages from a tortfeasor where the injured party has been paid the wages by his employer is to be determined by the evidence. The rule of law is clear: if the payments by the employer were a gratuity or gift, claimant may recover for loss of wages against a third party tortfeasor. *The generosity of the employer does not redound to the benefit of the wrongdoer.'* "* This statement of sound policy was originally enunciated by Judge ARNOLD of the Superior Court (now Justice of this Court) in the case of *Schwoerer Philadelphia,* 167 Pa. Superior Ct. 356, 360, on July 20, 1950.

---

* Italics mine unless otherwise indicated.

Although the Majority cites the *Stevenson* case to support Renick's claim to the Kite salary as against the amount the jury required him to pay, the *Stevenson* case actually takes Renick in the opposite direction. The quoted case says that whether a disabled employee should receive damages which will cover wages paid him by his employer during the period of the disablement "is to be determined by the *evidence*." The evidence, accepted and approved by the jury, established that the plaintiff *was* entitled to damages for salary, even though already paid by the employer.

Justice ARNOLD said in the *Schwoerer* case, supra, page 360: "Since the plaintiff rendered to his employer no service of any kind (during the period of disability), the sums paid to the plaintiff by his employer *must* be a gift or gratuity. (Italics in original Opinion.)

If the plaintiff did not render any services during the period in question, the salary paid to him *must* be a gift or gratuity. It certainly cannot be argued that the plaintiff in this case was rendering any service to his employer while he was on the operating table, while he was immobilized in a hospital bed, while his leg was in a cast, while he was bedfast at home, and while he could move only in a wheel chair or on crutches. The plaintiff did report to his office when he was able to do so, but he had to keep his injured leg elevated on a stand. The cast was not taken off his leg until May 20, 1954. His job required him to do "a considerable amount of traveling." Naturally, he could not travel during the entire period of his incapacitation. Thus, the facts in the case speak themselves of an empty service which made the salary paid the plaintiff a gratuity, whether it was so denominated or not.

The Majority Opinion calls into review cases of the past where reductions were made in verdicts, but this Court should not prepare a Procrustean bed on which

to place verdicts for lopping, so that they may fit artificial standards.* The Majority cites the case of *LaPosta v. Himmer*, 358 Pa. 69, decided in 1947, to justify its reduction of the verdict in the instant case. But the utter unreliability of that case as a measuring stick is evident, firstly, in that the cost of living during the last ten years has rocketed into the stratospheric regions; and, secondly, the dollar, which, although showing signs of atrophying in 1947, had not reached the wheel chair stage of today. Then it must be noted also that there is a vast difference between the wages which were paid LaPosta and the salary paid Kite. At the time of his accident, LaPosta was receiving $90 a week. At the time of his accident, Kite was receiving $382 a week. It certainly does not require a mathematical genuis of the stature of Einstein to compute that in a year's time Kite would lose more at $382 per week than LaPosta would lose at $90 per week.

The other case of *McCarthy v. Ference*, 358 Pa. 485, also cited by the Majority, and which was decided in 1948 (while the dollar still had a few powerful friends on the Rialto) is equally inappropriate to a consideration of the verdict in this case because the plaintiff there was 26 years of age (as compared to Kite's age of 61) and the Opinion of the Court does not state what his year's, monthly, or weekly wages were.

The Majority reduces the verdict by $10,000 but does not specify how it arrives at that figure. The jury did not say that it had awarded $10,000 for lost wages. It returned a general verdict of $40,000 after listening to the Judge's charge which said: "The fact that his employer paid him is not to enure to the benefit of any-

---

* Procrustes of Greek legend used also to stretch his victims if they were too short for his bed. This Court does not augment verdicts.

one who is liable for the damages, so that is an item that you are to consider in your deliberations as to the amount of the verdict, if you find there is to be a verdict for Mr. Kite."

The Judge merely said that the jury was to consider the matter of lost wages as an "item." It may be that the jury did not allow all of $10,000 for wages, but awarded substantial sums for pain, suffering, and inconvenience, for the nervous sensations described by the plaintiff, for the possible future operation, and for brain injury. Who can decide with precision how much one should receive in money when the very rudder of the ship of life has been damaged, no matter for how short a period? Once the delicate membranes of the brain have been lacerated, one can no more be certain that they will heal and the scars vanish than that scratches on fine Venetian glass will disappear with the passage of time.

I dissent.