## Stevenson *v*. Pennsylvania Sports and Enterprises, Inc., Appellant.

Argued October 7, 1952. Before DREW, C. J., STERN, STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*James J. Burns, Jr.,* for appellant.

*John E. Evans, Jr.,* with him *Evans, Ivory & Evans,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, November 25, 1952:

Plaintiff obtained a verdict for $12,000 for injuries sustained when he fell down a flight of four steps located in the balcony of defendant's sports amphitheater, called The Gardens, located at Fifth Avenue and Craig Street, Pittsburgh. Defendant filed motions for a new trial and judgment *non obstante veredicto*. The lower court denied the motion for judgment *non obstante veredicto* and refused the motion for a new trial provided the plaintiff filed a remittitur of all of the verdict in excess of $9,000, which was done. Defendant now appeals, asking for (a) judgment *non obstante veredicto*; (b) a further reduction in the verdict; (c) a new trial.

On January 27, 1949, plaintiff, a manager for a chair rental concern, together with two assistants, drove to defendant's amphitheater to pick up some chairs owned by the concern which had been rented to the defendant for use the preceding evening. The west end of the amphitheater faces Craig Street while the south end runs along Fifth Avenue. After parking their truck on Fifth Avenue, the three men proceeded to load the chairs. Upon investigation plaintiff found that seven or eight of the chairs were missing. Thereupon he went to the office of the manager of the amphitheater and was told by him to look around for the chairs. (It is not disputed here that the plaintiff was a business invitee.) The amphitheater had the customary tiers of seats with a balcony, surrounding an arena. A search of the lower levels did not reveal the missing chairs, so plaintiff went to the balcony in his effort to find them. To the rear of the last seats in the balcony there was a walkway or aisle about three feet wide. Plaintiff was on the north side of the building and was walking from east to west. Consequently on his right was the wall of the building and on his

left were the balcony boxes. As he was walking along looking for his chairs, he fell down a flight of steps.

It developed that this flight of steps, about 40 inches in height, led down to a platform which ran for a distance of approximately 16 feet along and behind the press box and then another flight of steps would bring a person walking in the direction that plaintiff was going, up to the same level as before. A bannister or railing ran along the left side of the aisle behind the boxes. The back of the press box was six feet high (measured from the platform floor), and was of solid wood. The floor of the platform was concrete and was painted dark red.

The lighting in the area became the crucial issue in the case. It was variously described by the witnesses but all agreed that the only lights which were on were the lights over the center of the building where a hockey team was practicing in the arena. Plaintiff testified that "The general appearance was that the aisleway continued on straight through." and "The areaway there, due to the press box interference created a shadow in that particular section.". He also testified: "Q. As you walked towards that area going in the direction of Craig Street, what was the general appearance of the aisle as you reached that place? A. The general appearance was a continuation of the aisle as I walked through. . . . Q. Any shadow or any darkness that there was as you walked along was not noticed by you until after you fell; isn't that correct? A. I can only answer that as I did before, to me it led up as a straight areaway, the same as that in which I had been walking. . . . Q. Will you answer that? And then you can make any explanation you want. A. I will have to answer that the same as I have answered the last two or three, that it all looked like a continuation of that floor." He said there was no natural light inside the arena. Exhibits showing various views of the

area were introduced into evidence by counsel for both parties.

We now turn to the contentions of counsel for the appellant. He argues in support of his motion for judgment *non obstante veredicto* that there was no showing of negligence and that the plaintiff was guilty of contributory negligence as a matter of law.

In order to relieve the defendant of any negligence, counsel points out that the press box which plaintiff claims cast a shadow over the area where he fell was not in front of the steps that led down to the east end of the lower level. However this may be, the press box was so close to this area that the jury could well have found that it cast a shadow and made the area look as though it continued on the level. The testimony is replete with evidence of inadequate lighting in the area. The maintenance man at The Gardens, Mr. Mark, testified that none of the lights available in the area were turned on. The plaintiff testified that there were lights in the area and that immediately after the accident they were turned on and gave sufficient illumination. While difference in floor levels does not in itself consist of negligence (*Strawhacker v. Stephen F. Whitman & Son,* 147 Pa. Superior Ct. 33, 23 A. 2d 349), it is negligence to fail to provide an area where there is a great difference in levels with adequate light so that a person who is properly in the area is warned: *Cathcart v. Sears, Roebuck and Company,* 120 Pa. Superior Ct. 531, 183 A. 113; *Kmiotek v. Anast,* 350 Pa. 593, 39 A. 2d 923.

The testimony of the plaintiff quoted in the statement of facts makes it clear that the question of contributory negligence was for the jury. Counsel for the defendant relies upon other testimony of the plaintiff which he contends indicates that the area was so dark that plaintiff should not have proceeded or that the plaintiff was not looking where he was going. As-

suming that this testimony does support these contentions, other testimony of the plaintiff supports the opposite conclusion. Where in one part of a plaintiff's testimony he is entitled to have his case submitted to the jury, and in another he is not, it is for the jury to reconcile the conflicting statements: *Greene v. Philadelphia*, 279 Pa. 389, 124 A. 134; *Bisaillon v. Philadelphia Rapid Transit Company*, 84 Pa. Superior Ct. 153, 156. We therefore are of the opinion that contributory negligence on the part of the plaintiff was for the jury.

The next contention of appellant is that it is entitled to a further reduction in the verdict. Plaintiff suffered a comminuted fracture of the right os calcis or heel bone. He remained in the hospital about ten days during which time a cast was put on, extending above his knee. This cast remained on for about two and a half months. Plaintiff did not return to work until July 1, 1949. At that time he still had difficulty with his foot and had previous to that time been given physiotherapy treatments. Dr. Faix stated that there was considerable damage to the soft tissue and that after the cast was removed plaintiff had severe swelling for several months. Dr. Epstein examined the plaintiff two months before trial (the trial was in February, 1952) and testified that at that time plaintiff had a partial disability ". . . estimated at 20 per cent, for the type of work which he was doing at the time he was hurt.". He further said that the condition was "Possibly permanent.".[1] Plaintiff had lost wages amounting to about $1,500[2] and had medical and hospital expenses of $665.50. Under such circumstances the trial judge thought that $9,000 was not excessive, and we agree.

---

[1] A more extensive discussion of this testimony follows.
[2] Also see infra for a more extensive discussion.

Appellant has raised other points which he contends entitle him to a new trial. First, he contends that appellee did not produce any evidence of loss of wages and therefore it was error to allow the jury to so find. The testimony in this connection was that plaintiff received the same salary during the five months he was disabled as he did before the accident. He contended, however, that this was in the nature of a gift and was not for services rendered. In *Schwoerer v. Philadelphia,* 167 Pa. Superior Ct. 356, 360, 74 A. 2d 755, the Court said: "Whether a plaintiff may recover loss of wages from a tortfeasor where the injured party has been paid the wages by his employer is to be determined by the evidence. The rule of law is clear: if the payments by the employer were a gratuity or gift, claimant may recover for loss of wages against a third party tortfeasor. The generosity of the employer does not redound to the benefit of the wrongdoer.". There is no doubt that in the instant case there was sufficient evidence that plaintiff did not in any manner perform his duties after the accident to the same extent as he did before. Plaintiff's wife variously testified that he only answered 'phone calls when they were referred to him from the shop and that he went out several times when it was necessary to solicit orders. The court below permitted the jury to find whether the money paid to him was a gift or wages. Although the plaintiff's testimony that the money paid to him was a gift did not make it so, (*Pensak v. Peerless Oil Company,* 311 Pa. 207, 166 A. 792), there was ample evidence here from which the jury could have concluded that plaintiff did not perform sufficient services to make the payments wages. He was obviously so disabled that he could not do the physical work of loading chairs which he did before the accident and the testimony as to his managerial activities after the accident could well have been found

to be merely incidental. *Pensak v. Peerless Oil Company,* supra, is distinguishable. In that case the plaintiff was one of the owners of the business and the Court held that his testimony characterizing the money as a gift did not make it so.

The second contention is that it was error for the court to permit the jury to include in its verdict plaintiff's claim for future disability. No exception was taken to the charge which on this question was as follows: ". . . Now, Dr. Faix did not testify that this thing is all cleared up at the present time but he didn't give us any idea that this was a permanent injury. As I recollect his testimony, he said that he believes the foot will gradually improve. So you have it, according to Dr. Faix's testimony, that there is inconvenience and difficulty in that foot now and it will continue but inasmuch as Dr. Faix did not give us an idea of any time in the future, you cannot consider that as a permanent injury and you cannot consider it as existing any great length of time after the day of this trial.".

The trial judge's discussion of Dr. Epstein's testimony was: ". . . Then he was asked the question of the future and Dr. Epstein, as I recall, said, 'Possibly it is permanent and possibly he will get better within a year. I don't have a definite opinion.' Well, if he doesn't have a definite opinion as a doctor, then you cannot decide as a question of fact that he has a permanent injury. Dr. Epstein wouldn't express it as a definite opinion and he used the word 'possibly'. He said, 'Possibly he will get better within a year.' Then he was asked what he meant by this 20 per cent disability and he said, as I recall, 'That's inability to do his work because of pain.' Now, he didn't say that he could not do the work, in other words, that his efforts are 20 per cent reduced, but he said, as I recollect, that he would have this inability because of the

pain in doing his work.". Defendant submitted a point for charge which read: "6. Because the plaintiff's medical evidence, as to his future disability, as given by his expert medical witnesses is in conflict, you cannot make any award to the plaintiff for disability in the future.".

The case of *Mudano v. Phila. Rapid Transit Co.,* 289 Pa. 51, 137 A. 104, relied upon by the appellant, is completely inapposite. In that case the problem was one of causation, i.e., whether the injury came from the accident or was the result of another cause. Thus in that case the Court required unanimity of opinion by plaintiff's medical experts that the injury resulted from the accident. The problem here involved is one of prognosis on which a doctor cannot be required to express his opinion with the definiteness required in a causation question. In many cases of personal injury the honest opinion of a doctor may well be that a plaintiff will "gradually improve" or that the injury may "possibly be permanent or may possibly get better within a year.". This uncertainty of honest medical opinion should not be the basis for any finding by the jury of *permanent* injury but is sufficient, on the other hand, for the jury to find some future disability. This the trial judge made clear in his charge and if he did not do so to the complete satisfaction of the defendant's counsel, an exception should have been taken.

There remains the contention of counsel for the appellant that counsel for the appellee made an unfair argument in his closing speech to the jury. After the arguments of counsel to the jury, the following colloquy ensued: "Mr. Burns: . . . And as to Exhibit 11, which counsel argued shows that there wasn't the light last Friday that we claim was there yesterday morning, that was only offered for the purpose of showing changes that were made at that point and was never

offered for showing illumination as it existed at the time of the accident. Mr. Evans: Certainly it is. We called Mr. Adamson, our last witness, in rebuttal in answer to illumination pictures taken Tuesday to show that he took his photograph on Friday in the presence of both counsel and he was asked if that represents the illumination. Mr. Burns: On Friday when he was there; no evidence the conditions were the same. Mr. Evans: The lights were on over the ice. Mr. Burns: That doesn't mean the same amount of light. The Court: He said he took a flash picture. Mr. Evans: And that that represented the illumination. I will be glad to have the record checked if your Honor is in doubt about it. The Court: It is for the jury; a matter for their recollection. Mr. Burns: To me it is such an improper argument that I don't think it should be left just in the air. It seems to me, if your Honor doesn't correct it, I should have an objection on the record. The Court: We will note your objection. Mr. Burns: As a matter of fact, it seems to me I should ask for the withdrawal of a juror, as not a proper argument in that regard. The Court: Do you want to do that? Mr. Burns: Yes. The Court: That motion is refused. Exception.". Nowhere in the record does it appear what counsel for the appellee said to the jury. Counsel for the appellant understands that the argument was directed to the fact that the condition of the illumination in Exhibit 11 was the same as that at the time of the accident. Counsel for the appellee contends that his argument only went to attacking the pictures of appellant taken during the trial. A motion for a new trial for alleged misconduct or improper remarks of counsel is directed largely to the discretion of the trial judge: *Donahue v. Punxsutawney Borough*, 298 Pa. 77, 148 A. 41. Where the remark is obviously prejudicial, it is an abuse of discretion for the court below to refuse a new trial: *Nar-*

*ciso v. Mauch Chunk Township,* 369 Pa. 549, 87 A. 2d 233. After carefully reviewing the testimony and the objection, we are of the opinion that the trial judge did not abuse his discretion.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

The only pertinent negligence pleaded is that the defendant "failed to furnish adequate and sufficient light for the use of plaintiff". Plaintiff was walking along an aisleway with open boxes and a rail on his left which he testified admitted "ample" light for him to see. Most of the confusion in this case arises from the testimony that in the areaway at the bottom of the steps there was a solid press wall and this wall darkened or shut out the light in this areaway. This is irrelevant since plaintiff failed to prove that it caused his fall or affected the light in the aisleway.

It is not negligence per se to have one floor at a lower level than another floor or to have steps leading from one floor to another: *Haddon v. Snellenburg,* 293 Pa. 333, 143 A. 8; *Strawhacker v. Whitman,* 147 Pa. Superior Ct. 33, 23 A. 2d 349. The crucial question is: Did plaintiff prove that the aisleway on which he was walking was not sufficiently lighted to enable him to see the commencement of the steps down which he fell?

Plaintiff testified as follows: "Q. So you were really going on down looking for chairs until something hap-happened; is that correct? A. Well, that's possibly correct. . . . Q. And your attention was mainly directed, then, to what might be in the boxes in the way of chairs; isn't that correct? A. Yes, sir. Q. And as you were doing that you were walking along and, as I assume, you probably had your head turned to the boxes; is that correct? A. That wouldn't be permanently. Q. No, but I mean generally as you walked down

there. A. Well, as you would walk along the railing looking for your chairs, you would try and watch where you were going subconsciously and at the same time be looking in the boxes. Q. As you were going down looking for your chairs and subconsciously, as you say, trying to look as to where you were going, you tell us that *you had ample illumination on the aisleway to see the aisle itself? A. Yes.** Q. You could see the floor of the aisle and you could see whether or not any of your chairs might have been stacked out there or were out there? A. There were no chairs out there. Q. Well, you know that because you had plenty of light to see it, didn't you? A. We could see there in the aisleway. (67a). . . . Q. But, in other words, you could see the floor in front of you as you walked up to the point where you fell; is that correct? I am not talking about steps; the aisleway you were walking on. A. If I were walking along there looking straight down at the floor, I would naturally see the floor, but walking along as I was it looked like a continuation. Q. All right. In any event, from where you got on, up at the Neville Street end, to the point where you fell, apparently you had ample illumination to see the aisleway that you walked along? A. I didn't see any hole there at all. I just continued walking. Q. In other words, you didn't see a shadow or a dark spot that was different from the rest of it at any time before you fell, did you? A. The floor all looked the same. Q. Now, had you been looking right down where you were putting your feet just before you fell, you could have seen the aisleway; is that correct? A. I should have. Q. *And you would have seen if there was a part in the aisleway that was dark, as you say, too dark to see anything; you would also have observed*

---

* Italics ours.

*that, would you not?* A. *Again, I should see it."*\*\* (p. 87a-88a) . . .

Where conflicts in testimony exist, it is ordinarily for the jury to reconcile such conflicts, but the law is equally well settled that where the burden of proof is upon the plaintiff to establish negligence or any other facts before a recovery can be had, and his testimony on the question is so uncertain or inadequate or contradictory or ambiguous as to present to the jury no basis for a finding except a mere conjecture, he cannot recover: *Musleva v. Patton Clay M. Co.,* 338 Pa. 249, 12 A. 2d 554; *Natvig v. P. R. T. Co.,* 293 Pa. 355, 143 A. 18; *Lithgow v. Lithgow,* 334 Pa. 262, 5 A. 2d 573; *Goater v. Klotz,* 279 Pa. 392, 124 A. 83.

I would grant judgment non obstante veredicto because plaintiff's testimony was inadequate and insufficient to prove negligence, and his admissions convicted him of contributory negligence.

If judgment n.o.v. is not granted, I would grant a new trial for the following reason. Plaintiff's employer paid him his regular salary throughout his five months' convalescence, during which time plaintiff performed substantial services for his employer. Plaintiff considered these payments were a gift and the jury was permitted to so find. The testimony on this point was as follows: "Mr. Evans: Q. As I understand, then, Mr. Stevenson, you did no work for profit or wages from the time you were hurt until you went back in July of 1949? A. That's correct. The Court: Q. Is that your answer, that you weren't paid for this period of time that you were off? Mr. Burns: He didn't say that. The Court: That's what I wanted to find out. If he

---

\*\* While no additional evidence is necessary, defendant's picture (Exhibit B), which the plaintiff did not deny was a true representation of the light at the scene at the time he fell, clearly shows ample light.

got paid then there is no damage for that period of time. If he got his $300 a month, then there is no loss. Mr. Burns: He didn't ask him that . . . Q. Between those dates did you receive any benefit or gift from your sister-in-law, Mrs. Holman? A. Mrs. Holman, because she was my sister-in-law, *perhaps* out of the goodness of her heart, did give me the equivalent of what I would have earned had I been working. Mr. Evans: I see. Cross examine. . . . Mr. Burns: Q. You mean, by that that you received from Mrs. Holman, that is, the owner of the business that you were working for, $300 a month; is that what you mean? A. Yes, sir. Q. And you consider that a gift because you say you did nothing to earn it; is that it? A. I certainly, by the standards of working, was not entitled to it. Q. Did you solicit business, however, during that time? A. There were a few occasions when I had Mr. Cochran drive me, call for me and take me out. Those were few occasions. Q. Did you solicit business on the telephone during that time? A. I took care of anything that came into my home or which was referred to me by phone. Q. Did you look after the supervision of the work in any way during that time? A. Well, if there were any questions or problems which came up, Mr. Heron would come to me with such problems and ask my judgment of what to do about them." (175a-177a).

As this Court said in *Pensak v. Peerless Oil Co.,* 311 Pa. 207, 210, 166 A. 792: "Characterizing as a gift the money paid to him does not make it so. To permit a recovery of money under the guise of wages lost would, [under these facts], open a wide door to misrepresentation and fraud in this class of cases."