547 A.2d 1180

**Evelyn MORGANSTEIN, Executrix of the Last Will and Testament of Morton Morganstein, Deceased, Appellant,**

**v.**

**Benjamin HOUSE, M.D., Appellee.**

Superior Court of Pennsylvania.

Submitted April 7, 1988.

Filed Aug. 18, 1988.

Reargument Denied Oct. 5, 1988.

Keith S. Erbstein, Philadelphia, for appellant.

Stanley P. Stahl, Philadelphia, for appellee.

Before WIEAND, BECK and HOFFMAN, JJ.

514

WIEAND, Judge:

In this appeal from the judgment entered following a defense verdict in a medical malpractice action, the principal issue is whether the trial court erred by instructing the jury on the "two schools of medicine" doctrine.

On June 24, 1980, Morton Morganstein made a professional visit to Benjamin House, M.D., who had been his physician for almost twenty years. Morganstein complained of pain in his left armpit, which radiated down his left arm. Dr. House was a primary care or family physician. Morganstein was overweight and had a history of hypertension; and Dr. House had been treating him regularly since 1962 for asthmatic bronchitis. On June 24, 1980, the doctor made a routine examination of his patient, took a history, found his blood pressure to be 140 over 80, and administered an electrocardiogram (EKG). House interpreted the EKG as being normal, observed that Morganstein was not in pain, diagnosed his patient's condition as presumptive coronary artery disease, and prescribed nitroglycerine as a therapeutic trial. Dr. House also advised Morganstein to restrict his activity, not to go to work, to return for additional evaluation on July 1, 1980, and to contact him immediately in the event of subsequent pains. Morganstein immediately returned to work. Two days later Mrs. Morganstein called and expressed concern for her husband's condition. Dr. House told her to have her husband call him. On the evening of June 26, 1980, Morganstein called Dr. House, inquired about test results, and said that he felt fine. He also reported that he had suffered left axillary pain for a few minutes the night before, for which he had taken nitroglycerine. Dr. House again recommended that Morganstein restrict his activity, told him to call immediately if the symptoms worsened, and said he would see him in a few days at the time of their scheduled appointment. On June 29, 1980, after a late night of socializing, Morganstein began to experience pain and placed a nitroglycerine tablet under his tongue. When the pain persisted, his wife called a nearby hospital, which agreed to see him immediately.

As he was leaving home about 2:00 a.m., Morganstein collapsed and died of a heart attack.

Letters testamentary were issued to Evelyn Morganstein, and she commenced an action to recover for her husband's death in which she alleged that Dr. House had been guilty of medical malpractice. At trial, Michael Barrett, M.D., a cardiologist, opined that the June 24th EKG had disclosed significant changes which suggested that the decedent had been suffering from unstable angina, a condition which required immediate hospitalization, in addition to nitroglycerine. However, defendant's cardiologist, Dr. Norman Makous, testified that his examination of decedent's EKG revealed no significant heart changes and that Dr. House's treatment under the circumstances had been in accordance with accepted medical practice. Dr. House also testified that neither the EKG nor any of his patient's symptoms had indicated unstable angina and that hospitalization had not been warranted. Following a four day trial, the jury returned a verdict in favor of the defendant physician.

After defining negligence and instructing the jury on causation, the trial court charged the jury as follows:

There was testimony here as to the proper or improper methods used or utilized by physicians in regard to cardiac problems. One expert testified one way, another expert testified differently. So that you will have to decide whether the manner followed by either or the other expert was proper or the method employed was proper. In assisting you in doing this, I wish to advise you that "a physician may rightfully choose to practice his profession in accordance with a school of thought which differs in its concepts and procedures from another school of thought, even though the school that he follows is a minority one. He will not be deemed to be negligent or practicing improperly so long as it is representable and respected by reasonable medical experts."

At the conclusion of the trial court's instructions, appellant's counsel recorded the following objection:

MR. ERBSTEIN: Your Honor, you discussed the competing schools of thought in conjunction with discussing the fact that the different experts in the case expressed different opinions. And in that chronological sequence of discussing that, I believe one gets the impression that if there are two experts who testify on the witness stand and one said one is appropriate and the other says the other is appropriate that if the doctor merely followed one of the things that one of the experts said—

THE COURT: If reputable.

MR. ERBSTEIN: I believe it was confusing, Your Honor. I take exception—

THE COURT: Okay.

Appellant contends that the trial court's instruction on two schools of medicine was inapplicable and inappropriate and should not have been given.

■ Initially, we must determine whether this issue has been properly preserved for appellate review. Appellee asserts that the present argument was not included in the objection made by appellant at trial, which was directed to the confusing nature of the instruction. We conclude that the issue of whether the inclusion of this portion of the court's instructions was confusing because inapplicable to the facts has been properly preserved for appellate review.

The doctrine of different schools of medicine has been clearly stated at 29 P.L.E. Physicians and Surgeons § 23 as follows:

A physician or surgeon is not bound to employ any particular mode of treatment, and where among physicians or surgeons of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for a physician to adopt either of such methods. Thus, in cases where medical authorities differ, a competent physician or surgeon is only bound to exercise his best judgment in determining what course of treatment is the best, and where competent medical authority is divided, a physician or surgeon will not be held responsible if, in the exercise of his judgment, he follows

a course of treatment advocated by a considerable number of his profession in good standing in his community. *Id.* (footnotes omitted).

The rule was first articulated in *Remley v. Plummer*, 79 Pa.Super. 117 (1922), where the issue was whether it had constituted negligence to administer a general anesthetic during minor surgery instead of a local anesthetic. The Superior Court stated the reason for the rule as follows:

The question actually passed upon by the jury was not whether the defendants, in their handling of the case, had been guilty of negligence in not following a well-recognized and established mode of treatment, but rather, which of two methods, both having their respective advocates and followers of respectable authority, was the safer and better from a surgical standpoint. In other words, in the face of conflicting reliable expert evidence as to what was the proper course to be pursued by the surgeon in charge of the case, twelve laymen, with no knowledge of medicine and surgery were called upon to decide a disputed scientific medical and surgical question upon which eleven physicians and surgeons of standing and experience could not agree, and as to which there is a wide divergence of competent authority....

*Id.* at 121. This, the Court said, had been error. "If the treatment is in accordance with a recognized system of surgery, it is not for the court or jury to undertake to determine whether that system is best, nor to decide questions of surgical science on which surgeons differ among themselves." *Id.* at 123, quoting 30 Cyc. 1588, section 8. The rule was subsequently adopted and made a part of the law of this Commonwealth by the Supreme Court in *Duckworth v. Bennett*, 320 Pa. 47, 181 A. 558 (1935). See also: *Brannan v. Lankenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980); *Trent v. Trotman*, 352 Pa.Super. 490, 508 A.2d 580 (1986).

However, the rule is not without limitation. In *Hodgson v. Bigelow*, 335 Pa. 497, 7 A.2d 338 (1939), a young boy had fallen on a stick which penetrated his thigh by several

inches. His physician treated the wound by cleaning and bandaging it. He did not give the boy an injection of tetanus anti-toxin. A tetanus infection caused the boy to suffer lockjaw. Plaintiff's experts testified that proper treatment for a puncture wound included an anti-tetanus injection. Defendant's experts opined that the wound had been a "lacerated" or "tunneling" type wound for which cleaning and bandaging constituted proper treatment. The trial court instructed the jury on the "two schools of thought" doctrine, and the jury returned a verdict for the defendant. The trial court set aside the verdict and granted a new trial. The Supreme Court affirmed. It held that where medical experts in a case agree as to the recognized and established proper treatment for a particular type injury but there is a dispute as to whether the plaintiff had that type of injury, the latter question is one of fact for the jury.

Similar limitations had been recognized by the Superior Court via dictum in *Remley v. Plummer, supra,* when it said:

[I]f there is a reasonably general agreement as to what is the proper medical treatment for a disease or the proper surgical treatment for an injury and there is a dispute as to whether the physician or surgeon in charge of the case used the method or means thus generally prescribed a question of fact is presented which is for a jury to determine. Or if the symptoms of a disease or the effects of an injury are so well known that a reasonably competent and skillful physician or surgeon ought to be able to diagnose the disease or injury, his negligence in failing to do so is likewise a matter of fact on which a jury of laymen may pass judgment.

*Id.* at 122.

Appellant argues that these limitations are applicable to the instant case. He contends that whether Dr. House should have diagnosed his patient's malady as an unstable angina requiring immediate hospitalization and treatment was an issue of fact for the jury. We agree. It was Dr. Barrett's testimony that the unstable angina was apparent

from the EKG reading and that the patient should have been hospitalized immediately. He conceded that most patients with stable angina can obtain relief with nitroglycerine. On the other hand, it was the testimony of Dr. House and Dr. Makous that neither the patient's symptoms nor the EKG had disclosed that the patient was suffering from an unstable angina requiring immediate hospitalization. Dr. Makous testified that under such circumstances, there having been no prior history of heart disease, it was sound medical practice to use nitroglycerine as a therapeutic trial and to aid in the evaluation of the patient's complaints. He did not negate a need for immediate hospitalization when a patient has unstable angina.

■ Whether Dr. House should have diagnosed Morganstein's condition as an unstable angina and hospitalized him for treatment and further testing was an issue of fact for the jury. To instruct the jury regarding two schools of medical thought, under these circumstances, was inappropriate.

■ Appellee argues, however, that the trial court's charge, when examined in its entirety, did not mislead the jury. This argument relies on the well-established principle that whether a charge is erroneous depends on an examination of the charge as a whole and not on isolated portions taken out of context. See: *Baker v. Pa. Nat'l Mutual Casualty Ins. Co.*, 370 Pa.Super. 461, 469, 536 A.2d 1357, 1361 (1987); *Mecca v. Lukasik*, 366 Pa.Super. 149, 167–168, 530 A.2d 1334, 1343 (1987); 10 St.Pa.Prac.2d § 59:52.

■ In the instant case, the principle of different schools of medical thought and its possible application were not further explained to the jury by the trial court. Therefore, it was possible for the jury to interpret the instruction as requiring a finding that Dr. House was not negligent so long as his conduct was supported by the testimony of another medical expert. We are constrained to conclude, therefore, that the erroneous instruction was neither harmless nor corrected by any other part of the court's charge.

Because it may have contributed to the verdict, a new trial is required. *Richmond v. A.F. of L. Medical Service Plan of Philadelphia*, 421 Pa. 269, 271–272, 218 A.2d 303, 304 (1966). *Ackerman v. Delcomico*, 336 Pa.Super. 569, 578 n. 1, 486 A.2d 410, 415 n. 1 (1984).

■ We find no merit in appellant's remaining assignments of error. Because there was evidence that the decedent had disregarded his physician's instructions regarding his returning to work and also regarding his use of nitroglycerine, the trial court could properly instruct the jury, as it did, on Morganstein's possible contributory negligence and the law of comparative negligence. See, e.g.: *McCullough v. Monroeville Home Ass'n*, 270 Pa.Super. 428, 411 A.2d 794 (1979) (if there is any evidence of contributory negligence it is reversible error to refuse to charge thereon).

■ Moreover, it would have been improper for the trial court to instruct the jury, as appellant urged, that it could draw an inference adverse to the defendant merely because only a portion of the electrocardiogram print-out had been retained. The evidence was that it was generally accepted medical practice to segment off and cut up electrocardiogram results, while retaining only a small portion thereof as a permanent record. In light of such evidence, the trial court properly refused appellant's request for an instruction that would have permitted the jury to draw an inference adverse to the physician because only a part of the EKG print-out had been retained. See generally: *Haas v. Kasnot*, 371 Pa. 580, 584–585, 92 A.2d 171, 173 (1952) (adverse inference applies only where party failing to produce evidence which is in its control and would naturally be in its interest fails to give a satisfactory reason for the omission); *Farley v. Southeastern Pennsylvania Transportation Authority*, 279 Pa.Super. 570, 577–580, 421 A.2d 346, 350–351 (1980) (per Watkins, J., with two judges concurring in result) (same).

Nevertheless, for the reason hereinbefore set forth, a new trial must be granted.

Reversed and remanded for a new trial. Jurisdiction is not retained.