556 A.2d 431

George D'ANGELIS, Jr. and Andrea J. D'Angelis, Co-Administrators of the Estate of George D'Angelis, III, Deceased Appellants,

v.

Alan S. ZAKUTO, M.D. and Bensalem Pediatric Associates, Inc., Appellees.

Superior Court of Pennsylvania.

Argued Nov. 30, 1988.

Filed March 29, 1989.

66

Donald E. Matusow, Philadelphia, for appellants.

Thomas W. Smith, Philadelphia, for appellees.

Before McEWEN, MONTEMURO and KELLY, JJ.

MONTEMURO, Judge:

This is an appeal from a judgment entered pursuant to a jury determination that appellants' decedent was not the victim of appellee's medical malpractice.

On Dec. 5, 1981, appellants brought their twenty-six month old son, Georgie, to appellee for examination. The child had been febrile for several days; he was coughing up mucus, his nose was running, the gland on one side of his neck was swollen, and he was suffering from diarrhea. The diagnosis was purulent rhinitis, and an upper respiratory infection, for which appellant prescribed erythromycin, a broad spectrum antibiotic, and Dimetapp, a cough syrup. On Dec. 19, appellants telephoned appellant's office to report the persistence of their son's cough. Appellee was not available, and one of his associates prescribed a stronger cough medication. On Dec. 25, Georgie's fever, which had abated, reappeared, and he was again brought in for examination. The chart entry for this visit indicates that the child's temperature was 104 degrees, the glands on both sides of his neck were swollen, his throat was red, and his chest was congested with rhonchi. Appellee treated these symptoms with a change of both antibiotic and cough syrup, this time prescribing oral penicillin and Ambenyl.

Since Georgie's fever had subsided, appellants decided that despite the persistence of his cough, he could be left with his aunt on New Year's Eve. Georgie slept during most of the night, awakening only when his aunt roused him to administer medication, and to move him to another room. The next morning, however, the child went into cardiopulmonary arrest. Despite efforts at resuscitation, Georgie died at 2:30 that afternoon.

Post mortem examination, without specifying cause of death, revealed that Georgie had suffered from acute and chronic pneumonia of the left lung. No culture was obtained, and no etiology for the pneumonia was given.

Appellants filed the instant suit, alleging medical incompetence on appellee's part for having failed adequately to examine, test, diagnose and monitor the baby's illness. At

trial, the deposition testimony of the pathologist who had performed the autopsy, Dr. Jane Chatten, revealed that based on her microscopic examination of the lung tissue, the pneumonia had been in existence many days and probably at least a week. Appellants' pediatric expert, Dr. William Bason, opined that the pneumonia had been present from the time of the Dec. 5 visit, and could have been detected by any one of a number of tests. More specifically, he noted that given the results of the autopsy, an X-ray would certainly have demonstrated the presence of pneumonia on Dec. 25. The post mortem absence of a specific pathogen was explained by the effects of the antibiotics administered. Both doctors attributed the infant's death to the pneumonia.

Neither of appellee's experts. Drs. Caroline Hall and Gerald Fendrick, were able to isolate cause of death, both testifying that the degree of pneumonia was insufficient to bring on cardiopulmonary arrest. Although both physicians agreed that pneumonia might be present despite the absence of rales, Dr. Hall testified that she believed appellee to have considered pneumonia as a possible diagnosis, but that the lack of signs justified his discarding it to explain the illness. Appellee indicated his view that the child had not presented symptoms serious enough to warrant testing, and that despite the persistence of the cough the two visits to his office represented two episodes of unrelated disease. Dr. Fendrick, in supporting this assessment posited viral infection as responsible for the cough. Despite his testimony that antibiotics were not useful in combating viral illnesses, it was stated that the two courses of treatment prescribed did operate to decrease the child's fever, and that because of the course of Georgie's illness, there was nothing further appellee could or should have done. Despite the autopsy findings, Dr. Fendrick, disagreed that the child had pneumonia on Dec. 25, reasoning that the boy was not sick enough. Both appellee's experts suggested that testing, inclusive of radiography, would have revealed nothing, and would not have resulted in treatment any different than that prescribed. The jury found that appellee had not been negligent.

Appellants have presented us with three issues, which we will address seriatim.

 It is first argued that the trial court erred in its charge on the "two schools of thought doctrine." Appellants do not contend that the charge should not have been given, but that its presentation was unclear, and failed to conform to Pennsylvania law.

The doctrine referred to has a secure place in our jurisprudence. *See Duckworth v. Bennett,* 320 Pa. 47, 181 A. 558 (1935); *Remley v. Plummer,* 79 Pa.Super. 117 (1922). It directs that "a lay jury is not to be put in a position of choosing one respected body of medical opinion over another, when each has a reasonable following among the members of the medical community." *Trent v. Trotman,* 352 Pa.Super. 490, 496, 508 A.2d 580, 584 (1986). *See also, Brannan v. Lankenau,* 490 Pa. 588, 417 A.2d 196 (1980).

The charge complained of was as follows:

A physician may rightfully choose to practice his profession in accordance with a school of thought which differs in its concepts and procedures from another school of thought. Even though the school that he follows is a minority one, he will not be deemed to be negligent or practicing improperly so long as it is reputable and respected by reasonable medical experts.

No further explanation of this doctrine was offered.

Counsel objected to the instruction on grounds that it may have led the jury to believe in the acceptability of a particular practice so long as that practice was condoned by any reasonable medical expert.

In a case presenting striking similarities to the one before us, this court has recently expounded on the limitations of the two schools of thought doctrine. In *Morganstein v. House,* 377 Pa.Super. 512, 547 A.2d 1180 (1988), appellant's decedent died as a result of undiagnosed unstable angina. An overweight man with a history of hypertension, Mr. Morganstein had visited his physician complaining of pain in his left armpit and arm. An EKG was taken, along with a

routine history, and nitroglycerine was prescribed pursuant to a diagnosis of presumptive coronary artery disease. No hospitalization or further testing was ordered. Several days later, having in the interim reported to Dr. House another, albeit brief, recurrence of the pain, Mr. Morganstein collapsed and died.

Predictably, the experts called at trial disagreed over the significance of the EKG readings and the symptoms presented. After the two schools of thought charge was given to the jury, counsel objected on grounds that it was inappropriate and misleading, giving the jury the impression that any expert validation of a particular course of treatment negates a malpractice verdict. We agreed.

The basis for our agreement was found in *Hodgson v. Bigelow*, 335 Pa. 497, 7 A.2d 338 (1939). There our supreme court noted that "where medical experts in a case agree as to the recognized and established proper treatment for a particular type injury but there is a dispute as to whether the plaintiff had that type of injury, the latter question is one of fact for the jury." *Morganstein, supra,* 377 Pa.Super. at 518, 547 A.2d at 1183. This purpose, consistent with the spirit of the two schools doctrine, is to remove from the jury's discretion those matters requiring medical expertise, and on which medical experts disagree among themselves, and to limit jury deliberations to matters in which

> the symptoms of a disease or the effects of an injury are so well known that a reasonably competent and skillful physician or surgeon ought to be able to diagnose the disease or injury, his negligence in failing to do so is likewise a matter of fact on which a jury of laymen may pass judgement.

*Id.* quoting *Remley v. Plummer, supra,* at 122.

The appellant in *Morganstein* argued that the question to be decided by the jury was whether the treating physician should have identified the symptoms of an unstable angina, realizing the need for hospitalization and further treatment.

The issue was therefore not the propriety of the specific treatment actually ordered, since both sides agreed on the usefulness of nytroglycerine under certain circumstances. Rather the jury was to determine if negligence was apparent from the physician's failure to recognize a disease whose existence is a matter of public knowledge.

Even as chest and arm pains are commonly believed to presage a heart condition of some kind in patients such as the overweight man in *Morganstein,* symptoms such as Georgie's are sufficiently familiar to conjure in the minds of laymen the possibility of pneumonia. Therefore, the question to be posed to the jury was whether Dr. Zakuto should have identified Georgie's condition as pneumonia and hospitalized him for treatment, or, at least ordered testing, specifically a chest X-ray. The experts agreed that treatment for the disease, antibiotics and cough medication, would not necessarily have been different, except perhaps in dosage, had a proper diagnosis been made. To deliver the two schools of thought instruction without elaboration under these circumstances was error.

This lack of explanation also becomes important with regard to the general principle argued by appellee that the charge may only be considered in its entirety, that a single erroneous or misleading instruction does not justify a new trial. *See Reilly by Reilly v. Southeastern Pennsylvania Transportation Authority,* 507 Pa. 204, 489 A.2d 1291 (1985). Despite appellee's argument to the contrary, it was in fact possible that the jury found no liability on appellee's part merely because two experts concurred with his management of the case. *See Morganstein, supra.* As our supreme court has stated:

> In determining whether fundamentally erroneous instructions require the grant of a new trial, whether such instructions did or did not bring about the complained of verdict is not the question. If it appears that such instruction *might* have been responsible for the verdict, a new trial is mandatory: *Reisberg v. Pittsburgh & Lake*

*Erie R.R.*, 407 Pa. 434, 180 A.2d 575 (1962). (Emphasis supplied).

*Jones v. Montefiore Hospital*, 494 Pa. 410, 418–20, 431 A.2d 920, 925 (1981).

We therefore find that relief is warranted.

■ Appellants have presented us with two further issues. They contend that the trial court erred in failing to sustain an objection to defense counsel's closing argument, which, it is alleged, misrepresented, and contradicted the evidence. Specifically, defense counsel referred to his experts' reliance on certain medical data contained in Georgie's death certificate, and in the deposition of the pathologist who performed the post mortem examination. Appellants claim that trial evidence demonstrates the experts' lack of familiarity with these documents such that a new trial is warranted.

> The grant of a new trial for improper remarks is within the discretion of the trial judge. *Stevenson v. Pennsylvania Sports and Enterprise, Inc.*, 372 Pa. 157, 93 A.2d 236 (1952). Further, an appellate court's "review of the grant of a new trial is limited to cases of gross abuse of discretion *by the trial judge* or the application of erroneous rules of law by the trial court." *Atene v. Lawrence*, 456 Pa. 541, 545, 318 A.2d 695, 697 (1974). (Emphasis added).

*Harvey v. Hassinger*, 315 Pa.Super. 97, 106, 461 A.2d 814, 819 (1983).

Herein, the standard for reversal has not been reached. The ignorance of which appellants complain the defense experts are guilty is belied by the record. In the case of one expert a reference to the content of the deposition testimony indicates knowledge of the document's contents, and in the other, direct testimony that he had reviewed the transcript, albeit somewhat undercut later on, provides the same demonstration. Insofar as the death certificate is concerned, appellants assume that because there is no reference to it, defense experts were unaware of its contents.

The only pieces of information contained on the certificate which might be considered medically critical are the following; Immediate cause of death is given as "Cardiopulmonary arrest" as the consequence of "pneumonia". The interval between onset and death is listed as "days." None of these items is revelatory since the same information is included in the autopsy report, and there is no dispute as to the experts' examination of the post mortem findings. As a result, even assuming that the experts were unaware of the death certificate per se, they were aware of its contents, and a reference to it by defense counsel, if error, is *de minimis.* In neither of the instances cited by appellants can the trial court's decision be termed a gross abuse of discretion.

Appellants' final claim is that a new trial should have been forthcoming because the evidence was against the weight of the evidence. The standard for determining the propriety of a trial judge's decision in refusing to grant a new trial on this basis is much the same as the narrow standard to be applied where it is claimed that improper remarks have been made.

[T]he grant or denial of a new trial will not be reversed on appeal absent either an error of law which controlled the outcome of the case, *Anzelone v. Jesperson,* 436 Pa. 28, 30, 258 A.2d 510, 510 (1969); *Allison v. Snelling & Snelling, Inc.,* 425 Pa. 519, 521, 229 A.2d 861, 862 (1967), or a palpable abuse of discretion where the ruling turns on the weight of the evidence. *Lobozzo v. Adam Eidemiller, Inc.,* 437 Pa. 360, 367–68, 263 A.2d 432, 436 (1970).

*Martin v. Johns–Manville Corp.,* 508 Pa. 154, 163, 494 A.2d 1088, 1093 (1985), *on remand* 349 Pa.Super. 46, 502 A.2d 1264, *appeal granted* 510 Pa. 574, 510 A.2d 1389, *rev'd.,* 515 Pa. 377, 528 A.2d 947.

We have already determined that the jury's view of the evidence may have been affected by the erroneous charge on the two schools of thought doctrine. Because it is

possible that the court's reading of the evidence was correspondingly affected by this same reasoning, and because relief has already been granted, we decline to address the weight question.

Reversed and remanded for a new trial. Jurisdiction is relinquished.

KELLY, J., files a concurring opinion.

KELLY, Judge, concurring:

While I agree with the majority's disposition as to appellant's first argument, I do so for different reasons. Both in the trial court and on appeal, appellants contend that the trial court's instruction, as given, on the "two schools of thought" doctrine was incorrect because it did not accurately state the law in Pennsylvania. Appellant maintains the charge given did not limit the application of the "two schools of thought" doctrine to cases involving schools of thought followed by a *considerable number of physicians.* *Remley v. Plummer,* 79 Pa.Super. 117 (1922). Thus, appellant argues, instead of weighing the testimony of plaintiffs' and defendants' experts to determine whether Dr. Zakuto had met the required standard of care, the jury could well have believed they could not hold Dr. Zakuto negligent as long as he had produced "reasonable medical experts" to testify on his behalf. I agree.

Plaintiffs' and defendants' experts presented differing opinions concerning the standard of care required of Dr. Zakuto in this case. Consequently, the trial court charged the jury on the "two schools of thought" doctrine applicable in medical malpractice cases, stating as follows:

A physician may rightfully choose to practice his profession in accordance with a school of thought which differs in its concepts and procedures from another school of thought. Even though the school that he follows is a minority one, he will not be deemed to be negligent or

practicing improperly *so long as it is reputable and respected by reasonable medical experts.*

(N.T. 7/__/86 at 681) (emphasis added).

The "two schools of thought" doctrine was first recognized in *Remley v. Plummer,* 79 Pa.Super. 117 (1922). In that case, the Superior Court stated:

> [W]here competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed the course of treatment advocated by *a considerable number of his professional brethren* in good standing in his community.

79 Pa.Super. at 122 (emphases added). In *Duckworth v. Bennett,* 320 Pa. 47, 181 A. 558 (1935), our Supreme Court reaffirmed the "two schools of thought" doctrine and defined the doctrine in exactly the same terms as this Court did in *Remley. See Duckworth v. Bennett, supra,* 320 Pa. at 51, 181 A. at 559.

The key language in *Remley* and *Duckworth* is the phrase "advocated by a considerable number of his professional brethren." This language defines and limits the scope of the "two schools of thought" doctrine as it is applied in Pennsylvania. The doctrine applies only to a school of thought advocated by "a considerable number" of reputable, and respected physicians. *See Brannan v. Lankenau Hospital,* 490 Pa. 588, 417 A.2d 196 (1980).

Instantly, the trial court charged that Dr. Zakuto could not be deemed negligent so long as his conduct conformed to a school of thought which was "reputable and respected by reasonable medical experts." As such, the charge as given was insufficient because it failed to include the language "advocated by a considerable number of his professional brethren" and thus did not accurately reflect the law in Pennsylvania as it relates to the "two schools of thought" doctrine. As a result, the jury may very well have found Dr. Zakuto acted appropriately because his conduct was condoned at trial by defendants' expert witnesses rather than weighing all the testimony to determine whether Dr. Zakuto had met the required standard of care. Therefore, I would reverse and remand for a new trial.