**Neilson v. Ruoti**

C.P. of Bucks County, no. 96-06047-13-1.

*Lindley M. Cowperthwait Jr.,* for plaintiff.
*John P. Shusted,* for defendant.

LAWLER, *J.,* September 30, 1999—Plaintiffs, John and Nancy Neilson, appeal the order of this court dated August 5, 1999, denying their motion for post-trial relief. Pursuant to Pa.R.A.P. 1925(b), plaintiffs have submitted a concise statement of matters complained of on appeal. This opinion is filed in accordance with Pa.R.A.P. 1925(a).

## BACKGROUND

During the summer of 1994, plaintiff Nancy Neilson developed severe pain in her right shoulder resulting from a large rotator cuff tear. When cortisone injections, physical therapy and other treatments failed to alleviate her symptoms, she elected to have surgery. On March 31, 1995, Dr. Robert E. Mannherz performed surgery to repair the tear. Unfortunately, surgical repairs of large tears like Mrs. Neilson's have a failure rate of up to 50 per-

cent, meaning as many as half never heal properly or are subsequently re-torn.

Following surgery, Dr. Mannherz prescribed physical therapy for the rehabilitation of Mrs. Neilson's injured shoulder. The prescription was accompanied by a protocol. A protocol is a written outline of generally agreed concepts given by the treating physician to a physical therapist, as a set of guidelines for the patient's therapy. The protocol followed in Mrs. Neilson's case was Dr. Mannherz' Type III Rotator Cuff Repair Rehabilitation protocol, which is used for large or complete tears. See plaintiffs' exhibit P-5. Initially, Mrs. Neilson performed all of her therapy at home, assisted by her husband. Beginning on April 11, 1995, she also treated with defendant Bux-Mont Physical Therapy three times per week, in accordance with Dr. Mannherz' prescription. During the early stages of her therapy Mrs. Neilson was permitted to perform only passive range of motion exercises.

On April 28, 1995, in accordance with Dr. Mannherz' protocol, her physical therapy regime was expanded to include "active assisted" exercises. "Active assisted" exercise means that the injured limb performs the exercise with assistance from an external force, whether it be another person, another limb, or a mechanical device. To complete one of these new exercises, Mrs. Neilson was instructed by therapist George Logue of Bux-Mont to lie flat on an exam table and lift an exercise wand towards the ceiling using both arms. While performing this exercise for the first time, Mrs. Neilson experienced considerable pain. Afterward, the pain continued, so she consulted Dr. Mannherz. It became apparent that the March 31 surgical repair had failed. In late June of 1995 she underwent a second surgery to repair her rotator cuff.

Mrs. Neilson never regained full mobility of her shoulder following the second surgery, and her shoulder provides consistent discomfort.

In August 1996, plaintiffs John and Nancy Neilson filed a complaint against defendant Bux-Mont and its owner, Richard Ruoti Ph.D., P.T., alleging that improper physical therapy administered by defendants caused the re-tear of Nancy Neilson's rotator cuff. A jury trial began on April 12, 1999. The factual issue presented to the jury was whether the defendant properly administered the therapy in accordance with Dr. Mannherz' protocol. At trial, this court overruled plaintiffs' objection to the use of Pa.SSJI (Civ.) 10.04, regarding the "differing schools of thought doctrine." The jury returned a verdict in favor of defendants.

## ISSUES ON APPEAL

Plaintiffs appeal the jury verdict rendered in favor of defendants, and have filed a concise statement of matters complained of on appeal listing seven points of error. However, these seven points are more appropriately summarized in the following two issues: First, plaintiffs argue that the court erred by instructing the jury on the "differing schools of thought doctrine," because that doctrine does not apply to physical therapists. Second, plaintiffs contend that even if the doctrine is applicable, the court's instruction was erroneous because the defendants failed to establish the existence of a second school of thought relating to the plaintiff's treatment.

## DISCUSSION

### 1. *The Differing Schools of Thought Doctrine Applies to Physical Therapists*

Under the differing schools of thought doctrine, "a medical practitioner has an absolute defense to a claim of negligence when it is determined that the prescribed treatment or procedure has been approved by one group of medical experts even though an alternate school of thought recommends another approach." *Jones v. Chidester,* 531 Pa. 31, 33, 610 A.2d 964, 965 (1992). The plaintiffs argue that physical therapists are not medical practitioners entitled to use the defense. However, they cite no authority in support of their position. Instead, plaintiffs contend that physical therapists are neither permitted nor required to exercise their judgement in the treatment of patients to the degree that a physician or surgeon would. Plaintiffs view this supposed lack of discretion as negating physical therapists' need for the doctrine's protection. The better view is that the decisions made by physical therapists regarding the treatment of their patients fall squarely within the class of judgements the doctrine is meant to protect.

The purpose underlying the doctrine is "to remove from the jury's discretion those matters requiring medical expertise, and on which medical experts disagree among themselves." *D'Angelis v. Zakuto,* 383 Pa. Super. 65, 70, 556 A.2d 431, 433 (1989). It is based on the premise that a jury should not be forced to choose one body of medical opinion over another, where both are respected and each garners a following within the medical community. *Havasy v. Resnick,* 415 Pa. Super. 480,

502, 609 A.2d 1326, 1336 (1992); *D'Angelis,* 383 Pa. Super. at 69, 556 A.2d at 432; *Trent v. Trotman,* 352 Pa. Super. 490, 496, 508 A.2d 580, 584 (1986). Although physical therapists are not usually medical doctors, they are members of a learned profession. Physical therapists are specially trained practitioners of the healing arts, and must be licensed in order to practice in Pennsylvania. See 63 P.S. §1301 et seq. Like a doctor's, the physical therapist's practice is governed by medical and scientific principles. Furthermore, as in medicine, differences of professional or medical opinion sometimes arise in the physical therapy field regarding the proper procedure for remedying a given injury. In deciding whether a physical therapist acted negligently, a jury should not be forced to choose one body of medical opinion over another when both views are respected and adhered to by a segment of the profession. A conflict among experts in the physical therapy field regarding the appropriate procedure to employ is essentially a matter requiring medical expertise, which should not be left to the jury's discretion.

The case at bar aptly demonstrates the propriety of applying the doctrine to physical therapists. This case was filed as a professional malpractice action. It was filed against a defendant who was providing treatment of a medical nature to the plaintiff. Both parties submitted proposed jury instructions derived from standard medical malpractice jury instructions. Three doctors testified as medical experts on behalf of the parties regarding the standard of care and the propriety of the procedures used by defendants to implement Dr. Mannherz' protocol. As a result, the court was confronted by conflict of professional opinion requiring medical expertise, which could

not be left to a lay jury to resolve without charging them on the differing schools of thought doctrine.

As will be outlined more fully below, the parties' respective experts established that there was more than one way to interpret the protocol, leaving the physical therapist to make a professional judgment. Even where there is a protocol in place to guide a physical therapist, he or she is required to exercise discretion in the interpretation and implementation of that protocol. Often, there is almost no guidance accompanying a prescription for physical therapy. Dr. Mannherz testified:

"My opinion is that I give very specific protocols to my therapists because I know what I did surgically and I'm ultimately responsible when something doesn't work; and so, you can ask most therapists that get protocols for PT after rotator cuff repairs and most of them get a prescription that says, 'Rotator cuff repair. Start rehab.' I do it this way because I want to give that therapist guidelines to what to do."

See plaintiffs' exhibit P-10, video transcript, Dr. Mannherz at 82. He also stated that a lot of orthopedic surgeons give the therapist more leeway in terms of the patient's treatment. *Id.* at 11. In such cases, the therapist must exercise even greater judgement and discretion.

### 2. *Defendants Established a Second School of Thought Relating to Plaintiff's Treatment*

The defendants presented enough evidence at trial to necessitate a jury instruction on the differing schools of thought doctrine. "Where competent medical authority is divided, a [physical therapist] will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number

of recognized and respected professionals in his given area of expertise." See *Jones,* 531 Pa. at 40, 610 A.2d at 969.

The two different schools of medical thought established in this case involve the proper procedure to be followed by a physical therapist when implementing Dr. Mannherz' Type III Rotator Cuff Repair Rehabilitation Protocol. The instruction in the protocol at issue here simply states, "Begin *active assisted* abduction/external rotation to 90 degrees and 45 degrees respectively." See plaintiffs' exhibit P-5. (emphasis in original) This basic guideline leaves a therapist like George Logue considerable room to exercise his judgment and discretion. The crux of the conflict concerns whether the exercises performed by Mrs. Neilson on April 28, 1995 (involving reaching for the ceiling with both arms using a cane or exercise wand) were appropriate for that stage of recovery, and within the Type III protocol. According to the school of thought advocated by plaintiffs' expert witnesses, the exercises employed by Mr. Logue amounted to negligence.

A. The School of Thought Advanced by the Plaintiffs

The testimony of Dr. Carl R. Goodman, plaintiffs' medical expert, presented the school of thought adopted by the plaintiffs. He is a board-certified medical doctor, specializing in rehabilitation and physical medicine. See plaintiffs' exhibit P-8, video transcript, Dr. Goodman at 11. In his video deposition, which was played for the jury at trial, Dr. Goodman opined that the exercises at issue were outside the standard of care for several reasons: First, they were beyond Dr. Mannherz' protocol, which governed the physical therapy Bux-Mont was sup-

posed to use. *Id.* at 13, 22-23, 29. Second, Mr. Logue failed to properly supervise the procedure because he did not use his own hands to provide assistance to a patient starting a new exercise. *Id.* at 13-14, 20-21, 24, 28. Third, the exercises at issue were active exercises, not active assisted exercises. *Id.* at 14, 27. Dr. Goodman concluded that these alleged breaches directly caused the failure of Mrs. Neilson's rotator cuff repair. *Id.* at 24, 29.

Plaintiffs also played for the jury the videotaped deposition of Dr. Mannherz, Nancy Neilson's treating surgeon. Dr. Mannherz is an orthopedic surgeon, licensed to practice medicine in Pennsylvania. His specialty is sports medicine. See plaintiffs' exhibit P-10, video transcript, Dr. Mannherz at 5. Dr. Mannherz reiterated that in his medical opinion, the exercises performed by Mrs. Neilson violated the standard of care, for the same reasons stated by Dr. Goodman. Dr. Mannherz agreed that the exercises performed were outside the guidelines of his Type III protocol. *Id.* at 27, 32, 36-37. He also concluded that the April 28 exercises were active in nature, stating:

"My understanding of what [Mrs. Neilson] described was done on that day would have been an active program. She was given a cane or a wand to use in the arm, but what she described she did, with lifting the arm forward, away from the table, up over her head or away from her head, could not have been done without essentially using those muscles in her right arm actively without really assistance from the opposite side." *Id.* at 31; see *id.* at 82. Dr. Mannherz also stated that in his opinion, the procedures performed with Mrs. Neilson at Bux-Mont on April 28, 1995 caused the re-injury to her rotator cuff. *Id.* at 39-40.

In addition to corroborating the opinions posed by Dr. Goodman, however, Dr. Mannherz also acknowledged the potential for a second school of thought applicable to this case. On cross-examination, Dr. Mannherz discussed a text titled *The Athlete's Shoulder. Id.* at 87. It was written by Dr. Andrews, with whom Dr. Mannherz previously trained. They worked together in developing Type I, II, and III protocols. Dr. Mannherz conceded that the text is authoritative in the field of shoulder surgery and subsequent physical therapy. *Id.* at 88. He acquiesced that Dr. Andrews follows a different school of thought, under which the exercises performed by Mrs. Neilson on April 28, 1999 would be appropriate at that stage of her rehabilitation. *Id.* at 88-95.

### B. The Opposing School of Thought Advanced by the Defense

"The burden of proving that there are two schools of thought falls to the defendant. The burden, however, should not prove burdensome." *Jones,* 531 Pa. at 40, 610 A.2d at 969. The trial court must initially determine whether the defendant has introduced sufficient evidence that there is a considerable number of professionals who agree with the defendant's procedure or treatment. *Id.*

To sustain their burden of proving that an alternative school of medical thought exists relating to the plaintiff's treatment, the defense introduced at trial the videotaped deposition of Dr. Joseph Iannotti. Dr. Iannotti is an orthopedic surgeon licensed to practice medicine in Pennsylvania. See defense exhibit D-5, video transcript of Joseph P. Iannotti M.D. at 6-7. His practice is limited to the shoulder, and he performs approximately 500 shoulder surgeries each year. *Id.* Dr. Iannotti testified:

"There is no rigid standard by which all orthopedic surgeons or all physical therapists provide rehabilitation after routine rotator cuff surgery . . .

"Within the broad scope, there is no one gold standard that everyone says this is exactly how we all do it." *Id.* at 12.

Speaking about the April 28, 1995 therapy session at issue in this case, Dr. Iannotti further indicated that the exercises performed by Mrs. Neilson were within the broad scope of accepted standards. *Id.* at 13. Later in the deposition, the following exchange took place:

"Q: Now, the exercises that were performed by Mrs. Neilson on April 28, 1995, you're familiar with those?

"A: Yes.

"Q: In your opinion, were those active assisted?

"A: Yes. Absolutely.

"Q: And can you tell the jury why?

"A: Well they were done in the supine position, which—

"Q: Lying down?

"A: —lying down . . . and Mrs. Neilson had the use of a cane, an exercise wand. So she was using the left arm to assist the motion of the right arm

"And how the cane is used is variable, but nonetheless, however it's used, there is assistance. So, by strict definition, that is active assisted range of motion, and it's standard. I said earlier, Dr. Mannherz' protocol is well within the standard of care for a routine primary rotator cuff repair, and my reading of protocol number three, which is Dr. Mannherz' protocol for this type of surgery, was followed exactly.

"It was started—the wand exercises—at post-op week number five, plus one day.

"Q: And in your practice, do you see, and do you recommend those type of exercises to be performed at the same time interval—

"A: Absolutely.

"Q: —as performed by Mrs. Neilson?

"A: Yes. We do that approximately the same interval . . .

"[A]gain, there is no standard by which you say every rotator cuff tear is done this way." *Id.* at 19-21.

In Dr. Iannotti's esteemed opinion, contrary to the school of thought advocated by plaintiffs, the exercises at issue in this case were clearly active assisted. Furthermore, unlike the plaintiffs, Dr. Iannotti considers the exercises to be within the protocol supplied by Dr. Mannherz. Dr. Iannotti also testified:

"Q: Doctor, we've heard opinions in this case from plaintiffs' experts that the use of the wand or the cane is not active assisted. Do you agree with that?

"A: Absolutely not. I mean—

"Q: Can you tell the jury why, please?

"A: Again, it goes back to the issue of what we all learned, I mean, and what I teach, and what other people have taught me.

"There is a basis for what we do. You can argue that what we do is wrong, and that's a legitimate argument, but we can't argue on the basic terminology, because the terminology is how we communicate . . .

"So the exercises that were done with the wand are absolutely within the standard of care . . . In the medical language, that's what active assisted range of motion is.

"Q: And is that supported in the medical literature?

"A: Absolutely. It's in every standard textbook—shoulder textbook, orthopedic general textbook, rehabilitation textbook.

"Q: And, is that contained in any of the numerous publications that you yourself have written? Its—

"A: Absolutely. I've written two monographs on rotator cuff surgery, it's the standard for rotator cuff repairs, published by the American Academy of Orthopaedic

Surgeons, and in both of those monographs, it clearly explains what is active assisted range of motion.

"It clearly uses a wand as a device for active assisted range of motion. As I said, it's the standard of care."*Id.* at 22-24.

Here, Dr. Iannotti provided factual support for the defense's assertion that a considerable number of recognized and respected professionals agree with his views. He references his own practice, but also his published works that have gone through the peer review process, and medical literature in the orthopedic and rehabilitation fields. He continued:

"Q: Doctor, in your opinion is the use of a wand or a broomstick in the supine position to raise the arms to 90 degrees an accepted active assisted exercise in patients such as Mrs. Neilson, for the beginning of five weeks post surgery?

"A: Yes, it is.

"Q: And what is the basis for your opinion?

"A: My basis is my own personal practice of hundreds and hundreds of rotator cuff repairs and patients who have had the surgery, and the basis of that opinion is also my thorough knowledge of the orthopedic literature and what is the standard of care.

"And my own work that's in my curriculum vitae supports that. And that has gone through the peer review literature, meaning other people have read my papers before they were published and accepted that what I've written as being the standard of care is the standard of care.

"So it's substantiated on many grounds.

"Q: And, is it proper to use an exercise wand five weeks after rotator cuff surgery?

"A: Absolutely.

"Q: And again, what is the basis for your opinion?

"A: The basis is the same three things. That is the standard by which I practice medicine, and I'm considered, I think, by most to be an authority and an expert in shoulder surgery.

"It's based upon the orthopedic literature, which is written by other individuals as well as myself, all of which have gone through the scrutiny of peer review, and it's standard." *Id.* at 37-39.

Dr. Iannotti established that under his school of thought, the exercises at issue were active assisted, within the protocol, and appropriate for Mrs. Neilson's stage of rehabilitation, without the need for George Logue to physically assist her.

At trial, this court determined that the defendants did meet their burden of establishing a second school of thought encompassing defendants' alleged improper procedure. Defendants may provide the factual support necessary to support a jury instruction on the doctrine solely through testimony of expert witnesses. *Gala v. Hamilton,* 552 Pa. 466, 715 A.2d 1108 (1998). The testimony of Dr. Joseph Iannotti for the defendants was sufficient to establish that a considerable number of physical therapists *and* physicians support the course of treatment that Mrs. Neilson received at Bux-Mont. Dr. Iannotti established that under the school of thought supported by defendants, the procedures followed by physical therapist George Logue were well within the standard of care.

When the defendant meets its burden of substantiating that "its actions were sanctioned by a recognized school of thought," the court must charge the jury on the doctrine. *Jones,* 531 Pa. at 40, 610 A.2d at 969. Here,

532

this court was required to charge the jury accordingly. For the above reasons, this court included Pa.SSJI (Civ.) 10.04 in its charge of the jury, and signed the order of August 5, 1999, denying plaintiffs' motion for post-trial relief.